# KNOXVILLE IRON COMPANY *v.* HARBISON.

ERROR TO THE SUPREME COURT OF THE STATE OF TENNESSEE.

No. 22.   Argued and submitted March 7, 1901.—Decided October 21, 1901.

The act of the legislature of the State of Tennessee, passed March 17, 1899, Statutes of 1899, c. 11, p. 17, requiring the redemption in cash of store orders or other evidences of indebtedness issued by employers in payment of wages due to employés, does not conflict with any provisions of the Constitution of the United States relating to contracts.

In the chancery court of Knox County, Tennessee, Samuel Harbison, a citizen of said State, on June 2, 1899, filed a bill of complaint against the Knoxville Iron Company, a corporation organized under the laws of the State of Tennessee, alleging

that he was the *bona fide* holder by purchase in due course of trade of certain specified accepted orders for coal that had been issued by the defendant company in payment of wages due to its employés; that he had made due demand for their redemption in cash according to law, which demand had been refused; and that he was entitled to a decree for the amount of said orders with interest. The company filed an answer, denying that the complainant was a *bona fide* holder of the orders in question, and alleging an agreement between the company and its employés that the latter would accept coal in payment of said orders, etc.

Proof was taken and the case heard by the chancellor, who rendered a decree in favor of the complainant for $1702.66 as principal and interest of said orders with costs. An appeal was taken by the defendant company to the Court of Chancery Appeals of Tennessee, an intermediate court of reference in equity causes, where the decree of the chancery court of Knox County was affirmed.

The facts as found by the Court of Chancery Appeals are as follows:

" The defendant is a corporation chartered under chapter 57, Acts of 1867—'8. The following powers are given by section 4: ' To purchase, hold and dispose of such real estate, not to exceed seventy thousand acres, leases, minerals, iron, coal, oil, salt and personal property as they may desire, or as they may deem necessary for the legitimate transaction of their business; to mine, bore, forge, smelt, work and manufacture, transport, refine and vend the same. The company to have and enjoy, and exercise, all the rights, privileges and powers belonging to, or incidental to corporations, which may be convenient to carry out any business they are in this act authorized to engage in.'

" The defendant has its principal office at Knoxville, where it is engaged in the manufacture of iron. As an incident to this business, it also mines and sells coal. Its mines are located in Anderson County. It works about two hundred employés. It has now and has had for many years a regular pay day, being that Saturday in every month which is nearest the 20th day of the month. Upon this pay day each employé is paid

in cash the amount then due him, excepting what may be 'due him from the first of the month up to said pay day ; that is, the company keeps in arrears with its employés all the time to the extent of their wages for about twenty days' time so far as concerns the matter of cash payments, but they may collect this sum and all sums that may be due them in coal orders, as stated below. It does not and will not pay cash to employés for wages at any other time than upon said regular pay days. Defendant, however, nearly always has on hand in its Knoxville yard a large amount of coal which it sells to all persons who are willing to purchase, whether such persons are its laborers or the public generally. For some time prior to the filing of the bill and at the time the bill was filed the defendant was and had been accustomed to accept from its laborers after work had been performed orders for coal in the following form :

"'Let bearer have——bushels of coal and charge to my account.

——— ———.'

" The defendant's employés are accustomed to sign orders, and in this form they are accepted by a stamp in these words:

"' Accepted——— 1899.

"' KNOXVILLE IRON COMPANY.'

" Many of the defendant's employés have never drawn an order on the defendant, and many others have used them only in the purchase of coal for themselves ; but the defendant in this way pays off about seventy-five per cent of the wages earned by its employés. Many of the employés who draw these orders get small wages, ninety cents to one dollar and twenty cents per day, and sell these orders to get money to live on, but those who get the largest wages, $65.00 to $175 per month, draw more of such coal orders in proportion than do those who get small wages. Defendant has never insisted upon any of its laborers giving any such orders but has been willing to accept such orders when any employé would draw them and ask their acceptance. Defendant, however, sets apart every Saturday afternoon, from one o'clock to five o'clock, for the acceptance of such orders. It makes some profit in accepting said orders in that, instead of paying the wages of its employés in cash, it

pays them in coal at 12 cents per bushel, and also, to some extent, its coal business is increased thereby. On the other hand, such orders are a convenience to the defendant's employés in the way of enabling them to realize on their wages before the regular monthly pay day and up to that pay day. When these orders are drawn by defendant's employés and accepted, defendant credits itself with said orders on its accounts with the persons so drawing them at the rate of twelve cents per bushel for the amount of coal called for by said orders. There is no proof of an express agreement between the defendant and its employés that the orders should be paid only in coal, unless the face of the order shall be construed as setting forth such an agreement. The only proof of any implied agreement to that effect is to be found in such inferences as may be drawn from the face of the orders and from the custom of the company to issue them and the employés to receive them on other than the regular cash pay days and the fact that no employé has ever presented one of such orders for redemption in anything else than coal. There is no proof of any compulsion on the part of the defendant upon its operatives, except in so far as compulsion may be implied from the fact that unless defendant's operatives take their wages in coal orders they must always on each monthly pay day suffer the defendant to be in arrears about twenty days—that is, that on the regular pay day on that Saturday which is the nearest the 20th of the month the defendant will not pay wages, except up to the last day of the preceding month, but will pay in coal orders the whole wages due at the end of each week, and that such is the course of business between the defendant and its employés. The complainant purchased six hundred and fourteen of said accepted orders from defendant's employés, and within thirty days from the issuance of each of said orders he presented each of them to the Knoxville Iron Company, defendant hereto, and demanded that it redeem them in cash, which was refused by defendant. Complainant is a licensed dealer in securities and sent his agents among the employés of the defendant to buy these coal orders. They had previously been selling at seventy-five cents on the dollar—that is, before the passage of chapter 11, Acts of 1899—but he in-

structed his agents to give eighty-five cents on the dollar, and the orders now in suit were purchased at that price. They amount in dollars and cents to $1678.00. There is no evidence of bad faith on the part of the complainant in the purchase of said orders."

The orders sued on in this case were issued after the passage of the act of March 17, 1899.

From the decree of the Chancery Court of Appeals an appeal was taken by the company to the Supreme Court of Tennessee, by which court the decrees of the courts below were affirmed. The case was then, brought to this court by a writ of error allowed by the Chief Justice of the Supreme Court of Tennessee.

*Mr. Edward T. Sanford* for the Knoxville Iron Company. *Mr. Cornelius E. Lucky* and *Mr. James A. Fowler* were on his brief.

*Mr. John W. Green* for Harbison submitted on his brief, upon which brief was also *Mr. Samuel G. Shields.*

MR. JUSTICE SHIRAS, after stating the case as above, delivered the opinion of the court.

This is a suit in equity brought to this court by a writ of error to the Supreme Court of the State of Tennessee, involving the validity, under the Federal Constitution, of an act of the legislature of Tennessee, passed March 17, 1899, Acts of 1899, c. 11, p. 17, requiring the redemption in cash of store orders or other evidences of indebtedness issued by employers in payment of wages due to employés.

The caption and material portions of this act are as follows:

"AN ACT requiring all persons, firms, corporations, and companies using coupons, scrip, punchout, store orders or other evidences of indebtedness to pay laborers and employés for labor, or otherwise to redeem the same in good and lawful money of the United States in the hands of their employés, laborers, or a *bona fide* holder, and to provide a legal remedy for collection of same in favor of said laborers, employés and such *bona fide* holder.

"SEC. 1. Be it enacted by the General Assembly of the State of Tennessee, That all persons, firms, corporations and companies, using coupons, scrip, punchouts, store orders or other evidences of indebtedness to pay their or its laborers and employés, for labor or otherwise, shall, if demanded, redeem the same in the hands of such laborer, employé or *bona fide* holder, in good and lawful money of the United States: *Provided,* The same is presented and redemption demanded of such person, firm, company or corporation using same as aforesaid, at a regular pay day of such person, firm, company or corporation to laborers or employés, or if presented and redemption demanded as aforesaid by such laborers, employés or *bona fide* holders at any time not less than thirty days from the issuance or delivery of such coupon, scrip, punchout, store order or other evidences of indebtedness to such employés, laborers or *bona fide* holder. Such redemption to be at the face value of said scrip, punchout, coupon, store order or other evidence of indebtedness: *Provided, further,* Said face value shall be in cash the same as its purchasing power in goods, wares and merchandise at the commissary, company store or other repository of such company, firm, person or corporation aforesaid.

"SEC. 2. Be it further enacted, That any employé, laborer or *bona fide* holder referred to in section 1 of this act, upon presentation and demand for redemption of such scrip, coupon, punchout, store order or other evidence of indebtedness aforesaid, and upon refusal of such person, firm, corporation or company to redeem the same in good and lawful money of the United States, may maintain in his, her or their own name an action before any court of competent jurisdiction against such person, firm, corporation or company, using same as aforesaid for the recovery of the value of such coupon, scrip, punchout, store order or other evidence of indebtedness, as defined in section 1 of this act."

The views of the Supreme Court of Tennessee, sustaining the validity of the enactment in question, sufficiently appear in the following extracts from its opinion, a copy of which is found in the record:

"Confessedly, the enactment now called in question is in all

respects a valid statute and free from objection as such, except that it is challenged as an arbitrary interference with the right of contract, on account of which it is said that it is unconstitutional and not the 'law of the land' or 'due process of law.'

"The act does, undoubtedly, abridge or qualify the right of contract, in that it requires that certain obligations payable in the first instance in merchandise shall in certain contingencies be paid in money, yet it is as certainly general in its terms, embracing equally every employer and employé who is or may be in like situation and circumstances, and it is enforcible in the usual modes established in the administration of governments with respect to kindred matters. The exact and precise requirement is that all employers, whether natural or artificial persons, paying their employés in 'coupons, scrip, punchouts, store orders, or other evidences of indebtedness' shall redeem the same at face value in money, if demanded by the employé or a *bona fide* holder on a regular pay day or at any time not less than thirty days from issuance (sec. 1), and that if payment be not so made upon such demand, the owner may maintain a suit on such evidence of indebtedness and have a money recovery for the face value thereof in any court of competent jurisdiction (sec. 2).

"There is no prohibition against the issuance of any of the obligations referred to, nor against payment in merchandise or otherwise according to their terms, but only a provision that they shall be paid in money at the election and upon a prescribed demand of the owner. In other words, the effect of the act is to convert into cash obligations such unpaid merchandise orders, etc., as may be presented for money payment on a regular pay day or as much as thirty days after issuance.

"Under the act the present defendant may issue weekly orders for coal, as formerly, and may pay them in that commodity when desired by the holder, but instead of being able, as formerly, to compel the holder to accept payment of such orders in coal, the holder may, under the act, compel defendant to pay them in money. In this way and to this extent the defendant's right of contract is affected.

"Under the act, as formerly, every employé of the defend-

ant may receive the whole or a part of his wages in coal orders, and may collect the orders in coal or transfer them to some one else for other merchandise or for money. His condition is bettered by the act, in that it naturally enables him to get a better price for his coal orders than formerly, and thereby gives him more for his labor; and yet, although the defendant may not in that transaction realize the expected profit on the amount of coal called for in the orders, it in no event pays more in dollars and cents for the labor than the contract price.

"The scope and purpose of the act are thus indicated. The legislature evidently deemed the laborer at some disadvantage under existing laws and customs, and by this act undertook to ameliorate his condition in some measure by enabling him or his *bona fide* transferee, at his election and at a proper time, to demand and receive his unpaid wages in money rather than in something less valuable. Its tendency, though slight it may be, is to place the employer and employé upon equal ground in the matter of wages, and, so far as calculated to accomplish that end, it deserves commendation. Being general in its operation and enforcible by ordinary suit, and being unimpeached and unimpeachable upon other constitutional grounds, the act is entitled to full recognition as the 'law of the land' and 'due process of law' as to the matters embraced, without reference to the state's police power, as was held of an act imposing far greater restrictions upon the right of contract, in the case of *Dugger* v. *Insurance Company*, 95 Tennessee, 245, and as had been previously decided in respect of other limiting statutes therein mentioned. Ib. 253, 254.

"Furthermore, the passage of the act was a legitimate exercise of police power, and upon that ground also the legislation is well sustained. The first right of a State, as of a man, is self-protection, and with the State that right involves the universally acknowledged power and duty to enact and enforce all such laws not in plain conflict with some provision of the state or Federal Constitution as may rightly be deemed necessary or expedient for the safety, health, morals, comfort and welfare of its people.

"The act before us is, perhaps, less stringent than any one considered in any of the cases mentioned. It is neither prohibitory nor penal; not special, but general; tending towards equality between employer and employé in the matter of wages; intended and well calculated to promote peace and good order, and to prevent strife, violence and bloodshed. Such being the character, purpose and tendency of the act, we have no hesitation in holding that it is valid, both as general legislation, without reference to the state's reserved police power, and also as a wholesome regulation adopted in the proper exercise of that power."

The Supreme Court of Tennessee justified its conclusions by so full and satisfactory a reference to the decisions of this court as to render it unnecessary for us to travel over the same ground. It will be sufficient to briefly notice two or three of the latest cases.

In *Holden* v. *Hardy*, 169 U. S. 366, the validity of an act of the State of Utah, regulating the employment of workingmen in underground mines and fixing the period of employment at eight hours per day, was in question. There, as here, it was contended that the legislation deprived the employers and employés of the right to make contracts in a lawful way and for lawful purposes; that it was class legislation, and not equal or uniform in its provisions; that it deprived the parties of the equal protection of the laws; abridged the privileges and immunities of the defendant as a citizen of the United States, and deprived him of his property and liberty without due process of law. But it was held, after full review of the previous cases, that the act in question was a valid exercise of the police power of the State, and the judgment of the Supreme Court of Utah, sustaining the legislation, was affirmed.

Where a contract of insurance provided that the insurance company should not be liable beyond the actual cash value of the property at the time of its loss, and where a statute of the State of Missouri provided that in all suits brought upon policies of insurance against loss or damage by fire, the insurance company should not be permitted to deny that the property insured was worth at the time of issuing the policy the full

amount of the insurance, this court held that it was competent for the legislature of Missouri to pass such a law even though it places a limitation upon the right of contract. *Orient Insurance Co.* v. *Daggs*, 172 U. S. 557.

In *St. Louis, Iron Mountain &c. Railway* v. *Paul*, 173 U. S. 404, a judgment of the Supreme Court of Arkansas, sustaining the validity of an act of the legislature of that State which provided that whenever any corporation or person engaged in operating a railroad should discharge, with or without cause, any employé or servant, the unpaid wages of any such servant then earned should become due and payable on the date of such discharge without abatement or deduction, was affirmed. It is true that stress was laid in the opinion in that case on the fact that, in the constitution of the State, the power to amend corporation charters was reserved to the State, and it is asserted that no such power exists in the present case. But it is also true that, inasmuch as the right to contract is not absolute in respect to every matter, but may be subjected to the restraints demanded by the safety and welfare of the State and its inhabitants, the police power of the State may, within defined limitations, extend over corporations outside of and regardless of the power to amend charters. *Atchison, Topeka & Santa Fé Railroad* v. *Matthews*, 174 U. S. 96.

The judgment of the Supreme Court of Tennessee is

*Affirmed.*

MR. JUSTICE BREWER and MR. JUSTICE PECKHAM dissented.