RAIL & RIVER COAL CO. v. YAPLE et al.

(District Court, N. D. Ohio, E. D. May 20, 1914.)

No. 233.

1. COURTS (§§ 282, 314*)—FEDERAL COURT—JURISDICTION—DIVERSITY OF CITIZENSHIP—FEDERAL QUESTION.

The district court has jurisdiction, by reason of diversity of citizenship and the presence of federal questions, of a suit by a West Virginia corporation against the Ohio Industrial Commission, to restrain the commission from enforcing Act Ohio Feb. 5, 1914 (104 Ohio Laws, p. 181), regulating the weighing of coal at the mines, on the ground of its unconstitutionality as violation of the federal Constitution.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 820–824, 860; Dec. Dig. §§ 282, 314.*]

2. CONSTITUTIONAL LAW (§ 48*)—STATUTES—VALIDITY.

A state statute must be sustained as constitutional, unless it is clearly shown to be in conflict with some constitutional provision.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. § 48.*]

3. CONSTITUTIONAL LAW (§ 81*) — MINES AND MINERALS (§ 86*) — POLICE POWER.

The police power extends to the making of regulations promotive of domestic order, morals, health, and safety, to the removal of causes giving rise to disputes between capital and labor, to provision for the safety

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

214 F.—18

and health of miners, and to the regulation of mines and mining and the conservation of minerals.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 148; Dec. Dig. § 81;* Mines and Minerals, Cent. Dig. §§ 216–221; Dec. Dig. § 86.*]

4. CONSTITUTIONAL LAW (§ 45*)—STATUTES—PUBLIC POLICY.

The courts may declare the public policy when the lawmaking power has remained silent, but when the people, acting within constitutional powers, have, by amendment to their fundamental law, enumerated the subjects of legislative action, the constitutional provisions and statutes enacted in harmony therewith must be enforced and not nullified by the courts.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 42; Dec. Dig. § 45.*]

5. CONSTITUTIONAL LAW (§ 45*)—DETERMINATION OF VALIDITY OF STATUTES—QUESTIONS CONSIDERED.

The court, in determining the constitutionality of Act Ohio Feb. 5, 1914 (104 Ohio Laws, p. 181), regulating the weighing of coal at the mines, enacted pursuant to Const. Ohio as amended by adding section 34 to article 2, authorizing laws for the comfort, health, and general welfare of employés, may not adjudge that the act does not provide for the health, safety, and general welfare of employés by supplying an incentive for more effectually removing coal dust, thereby minimizing the danger from its continued presence in mines.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 42; Dec. Dig. § 45.*]

6. CONSTITUTIONAL LAW (§ 45*)—DETERMINATION OF VALIDITY OF STATUTES—JUDICIAL AUTHORITY.

The court in determining the constitutionality of Act Ohio Feb. 5, 1914 (104 Ohio Laws, p. 181), regulating the weighing of coal at the mines, adopted pursuant to Constitution as amended by adding section 36 to article 2, authorizing laws for the regulation of methods of weighing coal and other minerals, may not adjudge that the business of mining coal is not so far affected with a public interest as to justify appropriate regulation of the manner of paying employés, when paid according to the quantity produced, where such regulations will operate to allay discord and conserve the coal supply, for the constitutional provision is designed to limit, by appropriate legislation, the freedom of contract as regards the methods of mining, weighing, and measuring coal.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 42; Dec. Dig. § 45.*]

7. CONSTITUTIONAL LAW (§ 89*)—IMPAIRING RIGHT TO CONTRACT—REGULATION OF MINES.

Act Ohio Feb. 5, 1914 (104 Ohio Laws, p. 181), regulating the weighing of coal at the mines in cases where miners are paid according to the quantity of coal produced, and empowering the Industrial Commission to fix the standard for compensation in case of disputes between operators and miners, does not restrict the right of contract for the labor of miners by the day, week, month, or year, or in any other manner, except as to quantity, that operators may deem proper, but the right of contract is only curtailed, where miners are paid according to quantity, to the extent that they shall be paid according to the total weight of the coal in the mine car, the contents of the car to include no greater percentage of impurities of slate, sulphur, rock, dirt, than is unavoidable as determined by the Industrial Commission, and the act is not invalid as impairing the freedom of contract.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 157; Dec. Dig. § 89.*]

8. CONSTITUTIONAL LAW (§ 46*)—STATUTES—OBJECTIONS—TIME TO MAKE.

The objection to the provision of Act Ohio Feb. 5, 1914 (104 Ohio Laws, p. 181), requiring the weighing of coal at the mines, which makes a violation of the act a misdemeanor punishable by fine for each distinct offense in the sum of not less than $300 nor more than $600, is premature when raised by a mining corporation seeking to enjoin the Industrial Commission from enforcing the act, if it be assumed that the penalties are a separate part of the act.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 43–45; Dec. Dig. § 46.*]

9. CONSTITUTIONAL LAW (§ 46*)—STATUTES—EXCESSIVE PUNISHMENT.

The provision of Act Ohio Feb. 5, 1914 (104 Ohio Laws, p. 181), regulating the weighing of coal at the mines, which makes a violation of the act a misdemeanor punishable by fine for each distinct offense in the sum of not less than $300, nor more than $600, does not impose such excessive punishment as will preclude a resort to the courts by a mining corporation to test the validity of the act.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 43–45; Dec. Dig. § 46.*]

10. CONSTITUTIONAL LAW (§ 62*)—DELEGATION OF LEGISLATIVE POWER.

Act Ohio Feb. 5, 1914 (104 Ohio Laws, p. 181), regulating the weighing of coal at the mines, and empowering the Industrial Commission, in case of disputes between operators and miners, to determine the amount of impurities to ascertain the amount of compensation based on the quantity of coal produced, is not violative of Const. Ohio, art. 2, § 1, as delegating legislative power to the Industrial Commission.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 94–102; Dec. Dig. § 62.*]

11. STATUTES (§ 107*)—TITLE—SUFFICIENCY.

Act Ohio Feb. 5, 1914 (104 Ohio Laws, p. 181), entitled "An act to regulate the weighing of coal at the mines," is not violative of Const. Ohio, art. 2, § 16, providing that no bill shall contain more than one subject, which shall be expressed in the title, since only one subject is embraced in the act.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 121–134; Dec. Dig. § 107.*]

12. COURTS (§ 366*)—FEDERAL COURTS—DECISIONS OF STATE COURTS.

The district court, in determining the validity of a statute of Ohio attacked on the ground that it violates Const. Ohio, art. 2, § 16, providing that no bill shall contain more than one subject, which shall be expressed in the title, will follow the decisions of the state court, holding that the constitutional provision is merely directory.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 954–957, 960–968; Dec. Dig. § 366.*]

13. MASTER AND SERVANT (§ 11*)—REGULATIONS AS TO COAL MINING—STATUTES—VALIDITY.

Act Ohio Feb. 5, 1914 (104 Ohio Laws, p. 181), regulating the weighing of coal at the mines, and empowering the Industrial Commission, in case of disputes between miners and operators to determine the amount of impurities in coal, to ascertain the amount of compensation based on the quantity of coal produced, enacted pursuant to Constitution as amended by sections 34, 36, added to article 2, authorizing laws establishing a minimum wage, and providing for the comfort, health, and welfare of employés, and for the regulation of methods of mining, weighing, and measuring coal and other minerals, is not repugnant to any constitutional provision, state or federal.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 11.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

14. INJUNCTION (§ 157*)—DENIAL OF INTERLOCUTORY INJUNCTION—SUSPENSION OF OPERATION OF DENIAL FOR APPEAL.

The district court, denying an interlocutory injunction to restrain the enforcement of Act Ohio Feb. 5, 1914 (104 Ohio Laws, p. 181), regulating the weighing of coal at the mines, will suspend the operation of the denial to enable complainant to appeal directly to the Supreme Court under Judicial Code, § 266 (Act March 3, 1911, c. 231, 36 Stat. 1162 [U. S. Comp. St. Supp. 1911, p. 236]), and apply to that court for orders of suspension or supersedeas.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 340, 342; Dec. Dig. § 157.*]

In Equity. Suit by the Rail & River Coal Company against Wallace D. Yaple and others, as members of and constituting the Industrial Commission of Ohio. On application for an interlocutory injunction. Denied.

Hoyt, Dustin, Kelley, McKeehan & Andrews, of Cleveland, Ohio (A. C. Dustin, of Cleveland, Ohio, of counsel, and Tracy, Chapman & Welles, of Toledo, Ohio, on the brief), for plaintiff.

Timothy S. Hogan, Atty. Gen., of Columbus, Ohio (James I. Boulger, of Chillicothe, Ohio, Robt. M. Morgan, of Cleveland, Ohio, and Clarence D. Laylin, of Columbus, Ohio, of counsel), for defendants.

Before WARRINGTON, Circuit Judge, and SATER and KILLITS, District Judges.

PER CURIAM. The plaintiff, a West Virginia corporation, a large producer of coal and employer of mine laborers, of whom there are more than 45,000 in Ohio, assails the constitutionality of the Ohio law of February 5, 1914 (104 Ohio Laws, p. 181), entitled "An act to regulate the weighing of coal at the mines," and asks for an interlocutory injunction against the defendants, who constitute the Industrial Commission of Ohio, to prevent them from enforcing and attempting to enforce any of the provisions of such act. The act, in so far as it need be considered, is set forth in the margin.[1]

[1] "Section 1. Every miner and every loader of coal in any mine in this state who under the terms of his employment is to be paid for mining or loading such coal on the basis of the ton or other weight shall be paid for such mining or loading according to the total weight of all such coal contained within the car (hereinafter referred to as mine car) in which the same shall have been removed out of the mine; provided, the contents of such car when so removed shall contain no greater percentage of slate, sulphur, rock, dirt, or other impurity than that ascertained and determined by the Industrial Commission of Ohio as hereinafter enacted.

"Sec. 2. Said Industrial Commission shall ascertain and determine the percentage of slate, sulphur, rock, dirt, or other impurity unavoidable in the proper mining or loading of the contents of mine cars of coal in the several operating mines within this state.

"Sec. 3. It shall be the duty of such miner or loader of coal and his employer to agree upon and fix, for stipulated periods, the percentage of fine coal commonly known as nut, pea, dust and slack allowable in the output of the mine wherein such miner or loader is employed. At any time when there shall not be in effect such agreed and fixed percentage of fine coal allowable

[1] Diversity of citizenship and the presence of federal questions confer jurisdiction. Siler v. Louisville & Nashville R. R. Co., 213 U. S. 175, 191, 29 Sup. Ct. 451, 53 L. Ed. 753; Michigan Central R. R. Co. v. Vreeland, 227 U. S. 59, 63, 64, 33 Sup. Ct. 192, 57 L. Ed. 417; Louisville & Nashville R. R. Co. v. Siler (C. C.) 186 Fed. 176, 179; Ohio River & W. Ry. Co. v. Dittey (D. C.) 203 Fed. 537, 589; Mutual Film Co. v. Industrial Commission of Ohio, 215 Fed. 138, decided in this district April 2, 1914.

The Ohio Coal Commission, appointed by virtue of a joint resolution of the General Assembly (103 Ohio L. p. 981) "to investigate and report an equitable method of weighing coal at the mines, when the employés are to be paid for their labor on the basis of weight, measure, or quantity, and that will at the same time be to the best interest of the consumers and protect the coal measures of the state," submitted a report in December, 1913, in which, following a review of the evidence and arguments of both operators and miners, it recommended for passage a bill which finally assumed the form of the present act. The information thus brought to the attention of the General Assembly, and to which counsel in the present hearing freely alluded, in so far

in the output of any mine said Industrial Commission shall forthwith upon request of such miner or loader or his employer, fix such allowable percentage of fine coal, which percentage so fixed by said Industrial Commission shall continue in force until otherwise agreed and fixed by such miner or loader and his employer. Whenever said Industrial Commission shall find that the total output of such fine coal at any mine for a period of one month during which such mine shall have been operating while the percentage of fine coal so fixed by said Industrial Commission has been in force, exceeds the percentage so fixed by it, said Industrial Commission shall at once make, enter and cause to be enforced such order or orders relative to the production of coal at such mine, as will result in reducing the percentage of such fine coal, to the amount so fixed by said Industrial Commission.

"Sec. 4. * * *

"Sec. 5. Said Industrial Commission shall have full power from time to time, to change, upon investigation, any percentage by it ascertained and determined, or fixed, as provided in the preceding sections hereof.

"Sec. 6. It shall be unlawful for the employer of a miner or loader of the contents of any car of coal to pass any part of such contents over a screen or other device, for the purpose of ascertaining or calculating the amount to be paid such miner or loader for mining or loading such contents, whereby the total weight of such contents shall be reduced or diminished. Any person, firm or corporation violating the provisions of this section shall be deemed guilty of a misdemeanor and upon conviction, shall be fined for each separate offense not less than three hundred dollars nor more than six hundred dollars.

"Sec. 7. A miner or loader of the contents of a mine car, containing a greater percentage of slate, sulphur, rock, dirt or other impurity, than that ascertained and determined by said Industrial Commission, as hereinabove provided, shall be guilty of a misdemeanor and upon conviction shall be punished as follows: For the first offense within a period of three days he shall be fined fifty cents; for a second offense within such period of three days he shall be fined one dollar; and for the third offense within such period of three days he shall be fined not less than two dollars nor more than four dollars. Provided, that nothing contained in this section shall affect the right of a miner or loader and his employer to agree upon deductions by the system known as docking, on account of such slate, sulphur, rock, dirt or other impurity."

as deemed material, is summarized in the next succeeding paragraph, and is as follows:

All mine employés are required to belong to the United Mine Work-- ers—the strongest labor organization in the country. They have had no difficulty in the past in securing fair wages. The system of paying miners long in vogue in nearly all Ohio mines originated when only lump coal was marketable, and is based on the amount of coal mined and passed over a 1¼-inch screen, which amount is assumed to be 28 per cent. The insistence of the miners that they are paid for but a part of the product of their labor began when the finer grades of coal became salable. Their persistent grievance, although it will not bear analysis, engendered disputes and bitter feeling between them and their employers. A statute (section 956, Page & A. General Code of Ohio), whose purpose is the avoidance of danger, especially in gaseous mines, wisely requires the removal of fine coal and coal dust from the mines, for the violation of which (section 976, Page & A. G. C.) the offender may be punished by fine or imprisonment, or both; but the miners, be- lieving their grievance to be just, have not always removed such coal and dust, and thereby neither obviate such danger nor conserve the coal supply. Generally stated, from 20 per cent. to 50 per cent. of the coal under the heretofore prevailing systems of mining has been left in pillars, ribs, and stumps. The coal so left deteriorates from exposure, becomes somewhat crushed by the overlying strata, and yields a more than ordinary percentage of fine coal, in consequence of which the min-- ers either wholly refuse to draw such supports, or decline to do so un- less paid a sum additional to the regular contract price. In many in- stances, on account of such unwillingness, those portions of mines which yield an unusual amount of fine coal have been abandoned, and the fuel so indispensable to industrial progress is lost. On account of dissimilarities in the character of coal, the quantity of fine coal pro- duced varies in different mines and even in different portions of the same mine; the variations in some instances being quite marked. The result is a variation in the wages of miners of equal skill and ability, and an advantage to operators obtaining an excess of fine coal as against the miners, and also as against other operators in districts in which an effort is made to secure as large a percentage of lump coal as is possible. The increased openings between screen bars, resulting from the wear incident to use, diminish the quantity of lump coal passing over such bars, to the loss of the miner. The failure to sub- stitute new screens is due in part to the negligence of the check weigh- man, authorized by statute (section 970, Page & A. G. C.) and selected and paid by the miners to call attention to the defective character of the screens, and in part to the carelessness of the operators in failing to maintain screens conforming to their contract. Each, however, charges the other with the responsibility of such failure, and instances have occurred in which the miners have struck and closed down mines on account of disputes and delays regarding the furnishing of new screens. Neither the charge that the operators so dump mine cars as to break the coal (by an excessive drop from such cars to the screens, for instance), nor the countercharge that the miners will not

permit such dumping as will eliminate the fine from the lump coal, is proved; but the cupidity and the carelessness of each are deemed factors worthy of consideration. If coal be shot from the solid, payment on the mine-run basis will result in an increased quantity of fine coal. Whether such increase will occur if the coal is undercut before it is shot down, as was done with about 95 per cent. of the coal mined at the time the report was filed, is, in view of the experience in other states having kindred statutes and the difference in the Ohio coal from that of other fields, problematical. If an increase occurs, it will operate quite prejudicially to the sale of Ohio coal. The adoption of the mine-run system will also cause, to the prejudice of the operators, a considerable increase in the amount of impurities brought to the surface, unless some way be found to protect the operator from the carelessness and indifference of the miner, and will require the inauguration of some method of cleaning. It will also necessitate some increased expenditure in the readjustment of tipples. The commission, in view of its findings so summarized as above, concluded that the present system of mining is inequitable, unjust, and productive of discontent. To obviate existing conditions, and to conserve the coal by supplying an incentive to employés to remove pillars, ribs, and stumps and the portion of mines yielding more fine coal than is usual, and to load and send from the mine the fine coal which is now left underground, the commission recommended that shooting from the solid be prohibited, and that the mine-run system of payment be adopted, but so safeguarded as to apply to clean coal only, i. e., coal so cleaned as to be marketable.

The plaintiff charges that the act, in lodging in the industrial commission the duty of determining the percentage of impurities unavoidable in the proper mining or loading of coal, and of fixing, in case of disagreement between the mine operator and his employés and until they subsequently agree, the percentage of fine coal allowable in the output of the mine, unreasonably, unnecessarily, and arbitrarily deprives the operator, whose business, it is alleged, is strictly private and unaffected by any public interest, from contracting with his employés for the production of coal containing more impurities or having a greater degree of purity than that which the Commission has fixed, and denies him the right to reject, and requires him to accept and to make payment for the total contents of each mine car, without deduction or diminution, so long as the percentage of impurities fixed by the Commission is not exceeded. It avers that the act is not designed to protect the morals, health, or safety of the public or of mine employés, and has no real or substantial relation as between the purposes attributed to it and the means devised for attaining such purposes, but has for its object the regulation of the relations between masters and such of their servants as are paid by weight for coal mined or loaded, and that it is therefore unconstitutional, in that it deprives the plaintiff of liberty and property without due process of law, and of the equal protection of the law as guaranteed by the fourteenth amendment and the Ohio Bill of Rights.

[2, 3] The act must be sustained, unless it can be clearly shown to be

in conflict with some constitutional provision. Board of Health v. Greenville, 86 Ohio St. 1, 20, 98 N. E. 1019, Ann. Cas. 1913D, 52; Schmidinger v. Chicago, 226 U. S. 578, 587, 588, 33 Sup. Ct. 182, 57 L. Ed. 364; Mutual Film Co. v. Industrial Commission of Ohio, supra. It came into existence through a claimed exercise of the police power, a power which extends to the making of regulations "promotive of domestic order, morals, health, and safety." Railroad Co. v. Husen, 95 U. S. 465, 471, 24 L. Ed. 527. Laws enacted in its appropriate exercise have been sustained whose purpose has been to remove causes which give rise to disputes and bickerings prejudicial to the good order of society (Camfield v. U. S., 167 U. S. 518, 524, 17 Sup. Ct. 864, 42 L. Ed. 260), to promote harmonious relations between capital and labor (McLean v. Arkansas, 211 U. S. 539, 549, 550, 29 Sup. Ct. 206, 53 L. Ed. 315), to avert strikes, violence, and bloodshed (State v. Peel Splint Coal Co., 36 W. Va. 802, 15 S. E. 1000, 17 L. R. A. 385; Knoxville Iron Co. v. Harbison, 183 U. S. 13, 21, 22 Sup. Ct. 1, 46 L. Ed. 55), to provide for the safety and health of miners (Freund, Police Power, § 115; Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 34 Sup. Ct. 359, 58 L. Ed. ——), and to regulate mines and mining, and to conserve and avoid the waste of fuel, minerals, and other natural resources (Barrett v. Indiana, 229 U. S. 26, 29, 33 Sup. Ct. 692, 57 L. Ed. 1050; State v. Ohio Oil Co., 150 Ind. 21, 49 N. E. 809, 47 L. R. A. 627; Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; Hudson Water Co. v. McCarter, 209 U. S. 349, 28 Sup. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560; Wilmington Star Mining Co. v. Fulton, 205 U. S. 60, 27 Sup. Ct. 412, 51 L. Ed. 708).

[4] The rule announced in McLean v. Arkansas, supra, which involved a statute akin to that here under consideration, has subsequently been so often approved by the Supreme Court as to be controlling in the present instance, if the Ohio act is not materially different from that of Arkansas and is free from the constitutional infirmities which resulted in the overthrow of the earlier statute for the weighing of coal before screening. 93 Ohio L. p. 33; In re Preston, 63 Ohio St. 428, 59 N. E. 101, 52 L. R. A. 523, 81 Am. St. Rep. 642. It is contended that the McLean Case is not an authority, on account (among other things) of the powers conferred on the Industrial Commission, the alleged absence of a provision granting to operators the right, under proper circumstances, to reject coal brought to the surface, the possibly heavy penalties that may be imposed on offending operators, and the alleged obscurity and uncertainty of the penalties to which transgressing employés will be subjected. It is further urged that the act must be held to be in excess of the state's police power, and contrary to its declared policy, in view of the Preston Case, which pronounced invalid a law less vulnerable, it is claimed, to constitutional objection. None of the state courts has passed upon the present statute. The courts may declare the public policy when the lawmaking power is silent, but when the people, acting within constitutional powers, have, by amendment to their fundamental law, enumerated the subjects of legislative action, such constitutional provision and statutes enacted in harmony therewith must be enforced and not nullified by the courts. Probasco v. Raine, 50 Ohio St. 378, 391, 34 N. E. 536.

[5] Subsequent to the decision of the Preston Case, the state Constitution was amended by adding to article 2 the following sections:

"Sec. 34. Laws may be passed fixing and regulating hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employés; and no other provision of the Constitution shall impair or limit this power."

"Sec. 36. Laws may be passed * * * to provide for the regulation of methods of mining, weighing, measuring and marketing coal, oil, gas and other minerals."

[6] Without determining the soundness of the argument that the act, indirectly at least, establishes a minimum wage, in that it insures the miner full pay for all coal mined in accordance with the prescribed regulation, it may not be said that, in supplying an incentive for more effectually securing the removal of fine coal and coal dust to the surface, and thereby minimizing or dissipating the danger arising from their continued presence in the mines, the act does not provide for the health, safety, and general welfare of employés. Furthermore, section 36 was designed to limit, by appropriate legislation, the freedom of contract as regards the methods of mining, weighing, and measuring coal. We are not prepared to hold that the Legislature, acting within the scope of that section, may not say that the business of mining coal is so far affected with a public interest as to justify appropriate regulation of the manner of paying employés when they are to be paid according to the quantity produced, and when such regulatory statute will operate to allay discord and strife and conserve the coal supply.

[7] The Ohio act does not restrict the right of contracting for the labor of miners by the day, week, month, or year, or in any other manner (except as to quantity) that the operator may deem proper. If the miner or loader by the terms of his employment is to be paid by the ton or other weight, the right of contract is then curtailed to the extent that he shall be paid according to the total weight of the coal contained in the mine car, such contents to include, however, no greater percentage of slate, sulphur, rock, dirt, or other impurities than is unavoidable, as determined by the Industrial Commission. If the employé should send to the surface an excess of such impurities, or of any of them, the operator is not required to accept the car or pay for its contents as delivered, but is at liberty to agree with him as to the deductions to be made on account of impurities. If no agreement is made, the offending employé may be prosecuted for his violation of the Commission's order as for a misdemeanor. If he be unable or unwilling to pay the fine imposed, he may be imprisoned in the county jail until his fine and costs are paid, or secured to be paid, or he is otherwise legally discharged, provided he be given credit upon his fine and costs at the rate of 60 cents per day for each day's imprisonment. Section 13,717, Page & A. G. C. He is thus subjected to penalties which are neither obscure nor uncertain. The act does not require the operator to mingle the contents of such a car with the other coal produced, or prevent his removing, by screening or otherwise, the excess of any impurities. It must be presumed that the Industrial Commission will perform its official duty and fix a standard which will exclude all slate, sulphur, rock, dirt, or other impurities, except such as is unavoidable.

The operator, if given the unrestricted right of contract, could do no more. If dissatisfied with the Commission's order, which by statute is made prima facie reasonable and lawful, he may petition for and obtain a hearing before the Commission as to those features, and may thereafter have a speedy review of its action by the Supreme Court of the state. Act February 27, 1913 (103 Ohio L. p. 95) §§ 25, 27, 38–42; article 4, § 2, Ohio Constitution. The Commission may of its own motion upon investigation modify or rescind any of its prior orders. The law permits the employer and employé to stipulate as between themselves what percentage of coal commonly known as nut, pea, dust, and slack shall be allowable in the output of the employer's mine. It is only in case of their disagreement that the Commission may designate such percentage, and its orders in that behalf must possess the same characteristics as those above mentioned, and are likewise subject to rehearing and review. If at any time for a period of one month during the operation of the mine the percentage so fixed is exceeded, the Commission is required to enforce its order against the offender, whoever he may be. The act prescribes no penalty for disobedience to such an order, but if, as claimed by defendants, section 43 of the act of February 27, 1913, applies, which we do not determine, an offending party may be fined not less than $50, nor more than $1,000 for his first offense, and not less than $100 nor more than $5,000 for each subsequent offense. In either event the attitude of the employer is no worse than that of the employé. The danger of an increase in the quantity of fine coal caused by shooting from the solid may, under the act of February 5, 1914 (104 Ohio L. 161), be wholly obviated, if the operator so elects, in that shooting of that character may not be done and is made a misdemeanor, unless the operator and a majority of his miners obtain from the Commission, upon application, an order permitting it.

[8, 9] A violation of the provisions of section 6 is made a misdemeanor punishable by fine for each distinct offense in a sum not less than $300 nor more than $600. If the penalties are a separable part of the act, which we need not now determine, the objection to it on account of them is premature. Flint v. Stone Tracy Co., 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312. If they are not separable, they are not so excessive as to preclude a resort to the courts for the purpose of testing its validity. It is not to be presumed that a prudent employer, wishing to test the law, will risk the possibilities of repeated violations of the Commission's orders.

[10] Every argument advanced to sustain the contention that the act delegates legislative power to the Industrial Commission in violation of section 1, art. 2, of the state Constitution was urged against the act, providing a board to censor motion picture films, approved May 13, 1913, in the case brought by the Mutual Film Co. v. Industrial Commission of Ohio, supra. To state our reasons for holding the present contention unsound, as we do, would be to repeat, in substance, what was said to the same point in that case. We are content to abide by the conclusion there reached.

[11, 12] The claim that the act is in violation of section 16 of arti-

cle 2 of the Ohio Constitution, which provides that "no bill shall contain more than one subject, which shall be clearly expressed in its title," is unavailing. But one subject is embraced in the act. Were it otherwise, we should follow the decisions of the state court, and hold that the provision of the Constitution above quoted is directory and not mandatory. State ex rel. v. Covington, 29 Ohio St. 102, 116.

[13] In view of the above quoted amendments to the Ohio Constitution, the present act's want of similarity to that considered in the Preston Case and its general resemblance in its principal features to that of Arkansas, the instant case is ruled by McLean v. Arkansas, and is well within German Alliance Insurance Co. v. Lewis, 233 U. S. 389, 34 Sup. Ct. 612, 58 L. Ed. ——, decided April 20, 1914. It is not repugnant to any constitutional provision, state or federal.

[14] The prayer for an interlocutory injunction is therefore denied. In order, however, to enable complainant to take an appeal directly to the Supreme Court of the United States, pursuant to section 266 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [U. S. Comp. St. Supp. 1911, p. 236]), and to apply to that court for an order of suspension or supersedeas, if it so desires, we have concluded to suspend the operation of the order of denial herein for a period of 15 days from the date of its entry.