No. 3858

Second Circuit

RADFORD v. LOUISIANA CEN. LBR. CO.

(December 23, 1930.  Opinion and Decree.)
(January 27, 1931.  Rehearing Refused.)
(March 2, 1931.  Writs of Certiorari and Review Refused by Supreme Court.)

S. R. Holstein, of Jena, and R. R. Reeves, of Harrisonburg, attorneys for plaintiff, appellee.

Stubbs & Thompson, of Monroe, attorneys for defendant, appellant.

DREW, J. Plaintiff alleges that he is the holder and owner, for a valuable consideration, of eighty-five trade checks or representatives thereof, issued by the defendant, Louisiana Central Lumber Company, at Webb, Catahoula parish, Louisiana; that all of the trade checks or representatives thereof were issued between the dates of May 1, 1929, and June 26, 1929, and all countersigned by one of the duly authorized and acting agents of said defendant; that the said trade checks were issued to employees of the defendant company in payment of wages due them at that time and that said employees transferred the trade checks to plaintiff for merchandise and cash at his place of business about one-fourth of a mile from the commissary of defendant.

He alleges that the said trade checks were redeemable in merchandise at the defendant's place of business, and are therefore payable to bearer, on demand, in current money of the United States, under and by authority of Act No. 228 of 1908, and particularly sections 1 and 2 thereof. He alleges demand on defendant at the next pay day after receiving the said trade checks. He prays for judgment for the amount of the alleged trade checks, to-wit, $690, and for the further sum of $250 as damages and attorney's fees.

Defendant filed an exception of no cause and right of action, plea of res adjudicata, and in answer attacked the constitutionality of the acts under which said suit is brought.

All of the above exceptions and pleas were overruled by the lower court.

Defendant in answer denies the essential allegations of plaintiff's petition, and alleges that the memoranda credit slips

upon which plaintiff founds his action are not checks, punchouts, tickets, tokens, or other devices issued by it, redeemable either wholly or partially in goods or merchandise; that the slips are written requests by its various employees and customers, to charge to their accounts for merchandise up to but not in excess of the amount stated in figures on the said slips or written requests for extension of credit.

It denies that the slips or written requests for credit constituted an obligation at the time of the signing of the slips or at any time since have they ever constituted an obligation of the defendant, redeemable in either merchandise or money, that the slips enumerated in plaintiff's petition and upon which he is suing have never been charged to the persons signing the same, and that defendant has paid in cash to said employees all wages due and earned by them.

The lower court rendered judgment in favor of plaintiff for the aggregate amount of the alleged trade checks, less three, on which there had been no demand for payment made, and rejected the demand for damages and attorney's fees. From this judgment, the defendant has appealed.

The defendant and appellant has urged with much force in this court the plea to the constitutionality of the act (Act No. 228 of 1908, as amended by Act No. 210 of 1924), as well as the exception of no cause or right of action. However, the conclusion at which we have arrived on the merits of the case makes it unnecessary to pass on the exception and plea of unconstitutionality.

The following is a copy of the document alleged to be a trade check:

"No. 1321.          Webb, La., 6-3, 1929.
   "Louisiana Central Lumber Company.
   "Please charge my account for merchan-dise amounting to $........ ...., not to exceed $3.00.
                    "(Signature) B. F. Mitchell
"Witness:
   "J. I. Blake.
"(Not good after date issued.)"

J. I. Blake was the bookkeeper, credit man, and manager of the commissary of the Louisiana Central Lumber Company, at Webb, La., where the company maintained a logging camp. The defendant company had two regular pay days per month, two weeks apart, as nearly as practicable in accordance with Act No. 25 of 1914, and on every regular pay day the defendant paid every employee the full amount of wages due him. Between the regular pay days, the employees, as well as other persons who were not employees, were allowed to buy goods and merchandise at the commissary on credit. Any customer applying for credit was required under the system inaugurated by the defendant to apply to the credit man, J. I. Blake, who, if he saw fit to extend him credit, would require the customer to sign the credit slip, as shown above, opposite the word "signature." Blake would date the slip and fill in the amount of credit he desired to extend to the customer opposite the words "not to exceed," and would either sign his name or initials opposite the word "witness." The customer would take this slip, and, upon presenting it to one of the clerks in the commissary, would be allowed to purchase goods and merchandise up to the amount of credit extended and shown by the credit slip. The customer was not allowed to buy more than the amount of credit extended him, but could buy less. If the amount he purchased was less than the amount of credit shown on the slip, the purchaser or clerk would fill in the amount in the space opposite the words "amounting to," and would attach to the credit slip an itemized account of the goods purchased showing the amount

of each item. The credit slip and the itemized account would go back to the bookkeeper's office at the end of the day's business, and the customer would be charged with the amount of goods purchased. There was no charge made when the slip was given the customer, and, if he did not use the slip to make purchases at the commissary, he was never charged with any.

Mr. Sheppard, the general manager of the defendant company, testified as to why this system was inaugurated. We quote from his testimony:

"We had several purposes in mind. The first purpose that we had in mind was to make the extension of credit to our employees a safe one, or a practice that would be on a safe basis so that there could not be any contention and dissatisfaction among our employees. Some of them felt that possibly some merchandise had been charged against their account which they did not get, and after the credit was authorized and the sale slip was filled out and the employee's account charged with the amount of merchandise which he actually obtained, that constituted a very clear and safe record so that if on pay day or at any later date, Mr. Franklin or any of the employees felt that some error had been made in their account, that the bookkeeper had charged them with merchandise or some other charge that they had not obtained, it was a very simple matter to get this record which was filed, and show it to Mr. Franklin and say: 'Mr. Franklin, there is a detailed record of the merchandise you got—look that over and see if any error has been made.' And by that practice, we avoid a great deal of dissatisfaction and complaint and conflict and suspicion among our employees that their accounts may be charged with something that they did not get."

Mr. Blake testified, and he is not contradicted, that, if an employee wanted cash instead of merchandise, he would sign a slip showing the amount he desired, and the cash money was then and there given to him, and that he never refused to give the cash when it was requested.

The employees knew that their accounts were not charged with the amount of the credit slip, unless goods were purchased on the strength of the said slip. Those who acquired the credit slips and transferred them to the plaintiff in this case were never charged with the amounts shown on the slips, and on the next regular pay day each of them received all wages due them by the defendant company.

The defendant company's employees were not required to accept their wages in merchandise, and it was only for their convenience that they were allowed to trade there on a credit between pay days. The record clearly shows that the eighty-five slips that plaintiff possesses were issued to men a great number of whom did not have any wages due them and to a number who were at the time indebted to the defendant company. We cannot say these credit slips were given in payment of wages due them by the defendant when the record clearly shows that some were indebted to defendant at the time while there were others to whom the defendant did not owe anything. There is no evidence to show that any of the men who acquired the slips and transferred them to plaintiff had as much due them by the defendant as the slips called for.

For instance, suppose that Mr. Blake, when credit was applied for by an employee, had merely walked down to one of the clerks and said to him, "Let this man have credit up to $10." Could anyone complain of that manner of doing business? We think not. There is no law prohibiting an employer from giving credit to his employee. If that be true, then there is no difference in what was done by giving the credit slips, other than one was in writing,

to prevent mistakes and misunderstandings, and the other was done without any written evidence.

The purpose of Act No. 228 of 1908, as amended by Act No. 210 of 1924, was not to cover such transactions as are before us in this case. The purpose of an act and the reason for such act, together with the wrong it was intended to cure or prevent, must be looked into in interpreting it. The reason and spirit of an act should be considered, as well as the cause which superinduced its enactment, in order to ascertain the true meaning thereof; regard should also be had as to the mischief it was intended to remedy. Act No. 228 of 1908, as amended and re-enacted by Act No. 210 of 1924, which amended and re-enacted the title of the act and section 3, reads as follows:

"Making any person, firm or corporation, liable on demand in current money of the United States on their regular pay day to any legal holder thereof, for the full face value of any checks, punchouts, tickets, tokens or other device, issued by them and redeemable either wholly or partially in merchandise at their or any other place of business, and providing penalties for the violation of this Act."

"Section 1. Be it enacted by the General Assembly of the State of Louisiana,

"That any person, firm or corporation issuing checks, punchouts, tickets, tokens, or other device, redeemable either wholly or partially in goods or merchandise at their, or any other place of business, shall, on demand of any legal holder thereof, on the next pay day of such person, firm or corporation issuing same succeeding the date of issuance of same be liable for the full face value thereof, in current money of the United States.

"Section 2. Be it further enacted, etc., "That any such checks, punchouts, tickets, tokens, or other device, issued by any person, firm or corporation, shall be considered and treated as payable to bearer. on demand, in current money of the United States, notwithstanding any contrary stipulation or provision which may be therein contained.

"Section 3. Be it further enacted, etc., "That in case of any person, firm, or corporation failing or refusing to pay any legal holder of any such checks, punchouts, tickets, tokens, or other device, issued by them in payment of labor, the full face value thereof in current money of the United States, on their regular pay day when demanded by such legal holder, such person, firm or corporation shall be guilty of a misdemeanor and upon conviction shall be fined not less than Fifty ($50.00) Dollars, nor more than Five Hundred ($500.00) Dollars, and may be imprisoned not more than ninety (90) days at the discretion of the court."

The purpose of the above act, as of all other legislation of this kind in this country, as well as in Canada and England, is to protect the laborer against the coercion and demand of his employer that he accept in payment of his wages less than the purchasing power of the dollar. Were it not for the power of the state to regulate payment of wages in aid of the protection of the laborer, then no one of the acts of a like character as Act No. 228 of 1908 could stand the test and be declared constitutional. It is solely because of the protection afforded the laborer that such modification and abridgement of a common and natural right, the liberty and freedom of contract, is authorized and permitted. When once this support is removed, then the very foundation in law for such legislation passes away, and, with it, the statute itself.

Act No. 228 of 1908, before being amended by Act No. 210 of 1924, did not include the phrase "in payment of labor"; however, when section 3 of said act was amended by the act of 1924, the phrase, "in payment of labor" is included. In sustaining the constitutionality of Act No. 228 of 1908, prior to the amendment of 1924, in the case of Regan v. Tremont Lumber Co., 134 La. 199, 63 So. 874, the Supreme Court of this state treated the act as though it included the words "in payment

of labor," and based its decision upon the case of Harbison v. Knoxville Iron Co., a Tennessee case reported in 103 Tenn. 421, 53 S. W. 955, 56 L.R.A. 316, 76 Am. St. Rep. 682, and affirmed by the Supreme Court of the United States in 183 U. S. 13, 22 S. Ct. 1, 46 L. Ed. 55. In the Knoxville Iron Company case, the decision rests upon the inherent power of the state to regulate the payment of laborer's wages. In the case of State v. Blake, 170 La. 185, 127 So. 592, 595, the Supreme Court of this state again quotes freely from the Knoxville Iron Company case, and said:

"The statement of the Tennessee case shows that the law was enacted to abolish a hardship which was being imposed upon laborers by their employers."

That was truly the purpose of Act No. 228 of 1908. Both subsequent acts, Act No. 210 of 1924, amending the 1908 act, used the words "in payment of Labor," and the act of 1926, which has been declared unconstitutional in the case of State v. Blake, supra, used the words "in payment of wages." Therefore Act No. 228 of 1908, as amended, must be construed as one dealing with the issuance of trade checks or other tokens in payment of wages.

What was the mischief that this statute was intended to remedy? It was not the giving of credit to the laborers between pay days. It was the giving him, in lieu of his wages, trade checks, tokens, etc. only redeemable in merchandise at the place of business of his employer. Prior to the passage of this act, there were concerns that paid off entirely with punchouts, coupon books, metal money, etc., only redeemable in merchandise at the commissary of the employer, and the laborer, in order to receive any cash, was forced to discount these different representations of money to someone who desired to purchase goods from the said commissary. That was the mischief that this act intend-

ed to remedy. It was not the intention to force the employer to pay his employees wages between pay days. It was not the intention of forbidding equality between the employer and employees in the matter of wages, and arbitrarily forbidding them to enter into a contract which might be desirable to both of them and not be harmful to anyone. Such an interpretation of the act would, no doubt, be to hold that it is unconstitutional. To hold that the credit slips sued on in this case were tokens, trade checks, or other devices within the purview of the act, when same are not shown to have been issued in payment of wages and are shown not to have been charged to the laborer's account, but only authorization for credit applied for by the laborer and when the same credit system was used in dealing with the public in general, would be to so interpret the act.

Trade checks, tokens, punchouts, etc., as used in the act, mean the issuing of some evidence of an obligation, admitting that the employer owes to the employee the amount set out on said check, or punchout, etc., together with a promise to pay upon presentation by the holder thereof. They are issued for definite amounts. The documents sued on in this case are not for definite amounts. The amount is not fixed, and there is nothing about the credit slips that indicate that the defendant herein is obligated to pay on presentation.

To redeem an obligation, there must be an outstanding obligation subject to redemption.

The instruments sued on not expressing or carrying an obligation of the defendant to pay, there is of necessity no obligation for it to redeem.

The issuance of a trade check, etc., presupposes the existence of a debt; it is issued by the obligor and received by the obligee in discharge of that debt. Just as

a debtor issues his bond or note in payment of a debt, so an employer issues a trade check in payment of a debt. There is a motive, cause, or consideration therefor.

It cannot be said that the instruments sued on are trade checks, etc., within the meaning of the act when there is no proof that the defendant owed anything to the employees who obtained them, and when it is shown, in fact admitted, that these slips were not charged to such employees. There was no motive, cause, or consideration for an obligation evidenced by a trade check, etc.

When pay day came around, the employees who had obtained these credit slips received in cash from the defendant all of the wages due them, without any deduction having been made for the said slips. Certainly no one would contend that the employee who had received all of his wages in cash could force the defendant to pay to him the amount of the credit slips he had obtained and still had in his possession, and certainly the transferree of said employee can have no greater right than the employee would have had, had he retained in his possession the said slips.

Appellee relies almost entirely on the decision in the case of State v. Blake, 170 La. 175, 127 So. 592, 596, in asking that the decision of the lower court be affirmed, and the judge of the lower court relied to a great extent on that decision in rendering judgment for the appellee, and we cannot say his construction of that decision is without foundation. However, the court in passing on that case had this to say:

"We do not express an opinion as to the right of a bona fide holder of such a merchandise order to collect the amount of the order in cash, because the record discloses that a civil suit is pending in the district court, in which E. W. Radford is suing the Louisiana Central Lumber Company for payment in cash of the amount of the merchandise orders held by him."

While the court apparently passed upon the question involved in this case in its discussion of Act No. 318 of 1926, under which Blake had been indicted, the question before the court was the unconstitutionality of the act, and it did not in any manner deal with the civil rights as between the parties in this case. We take it that the entire discussion in the State v. Blake case was to show that the act in question was repugnant to the Fourteenth Amendment to the Constitution of the United States. For the court, after holding that the issuing of such an order as is in this case was a violation of the act of 1926, also said that the law would likewise have been violated if the laborer in that case, without an order, had bought goods at the commissary of his employer and the price of same had been charged against his wages. The 1926 act was purely a prohibitory act with a penalty, and did not in any way involve the question in this case, which is purely a civil action for the collection of money.

We therefore find that the instruments sued on in this case were not issued in payment of wages of laborers, and are not checks, punchouts, tickets, tokens, or other device redeemable wholly or partly in merchandise within the purview of Act No. 228 of 1908, as amended by Act No. 210 of 1924; that they were credit slips authorizing that credit be given at the store of defendant, issued without any consideration and bearing no obligation on the part of the defendant to redeem.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be reversed and the demands of plaintiff rejected at his cost in both courts.