R. C. TWAY COAL CO. et al. v. GLENN et al.

CLARK v. R. C. TWAY COAL CO. et al.

BALTIMORE TRUST CO. v. NORTON COAL MINING CO.

Nos. 996, 997, 808.

District Court, W. D. Kentucky.

Nov. 14, 1935.

In case No. 996:

Woodward, Dawson & Hobson, of Louisville, Ky., for plaintiffs.

Bunk Gardner, U. S. Dist. Atty., and Oldham Clarke, Asst. U. S. Dist. Atty., both of Louisville, Ky., and John Dickinson, Asst. Atty. Gen., and John S. L. Yost and Carl McFarland, Sp. Assts. to the Atty. Gen., for defendant.

In case No. 997:

Selligman, Goldsmith, Everhart & Greenebaum, of Louisville, Ky., for plaintiff.

Woodward, Dawson & Hobson, of Louisville, Ky., for defendant.

Bunk Gardner, U. S. Dist. Atty., and Oldham Clarke, Asst. U. S. Dist. Atty., both of Louisville, Ky., amicus curiæ.

In case No. 808:

Frank M. Drake, of Louisville, Ky., for petitioner.

HAMILTON, District Judge.

The three above-styled causes relate to the same subject-matter, and for that reason this opinion is applicable to all of them, although they have not been consolidated for hearing.

The first suit is an action (Equity No. 996) instituted by nineteen corporations, all of them miners and producers of bituminous coal in the Eastern Kentucky coal field, and together they represent all the producers of any substantial size in that district except the producers of captive coal.

The plaintiffs state that Selden R. Glenn, defendant, is a citizen of the commonwealth of Kentucky, residing in Louisville, Jefferson county, in the Western district of Kentucky, and the duly appointed, qualified, and acting collector of internal revenue for the district of Kentucky, and as such collects all taxes, assessments, and levies made or attempted to be made by the United States which are collectible in Kentucky through the Internal Revenue Department.

This suit is one of a civil nature, arising under the Constitution and laws of the United States, and presents an actual controversy between each of the plaintiffs and the defendant, and the amount involved exceeds $3,000.

The plaintiffs, after setting out the provisions of Public No. 402, 74th Cong., H. R. 9100 (15 USCA § 801 et seq.) "An Act To stabilize the bituminous coal-mining industry," claim it is unconstitutional and void on the following grounds:

Section 4 of the act (15 USCA § 805) requires the formulation by the National Bituminous Coal Commission, composed of five members appointed by the President, of a working agreement to be known as the "Bituminous Coal Code," such code to deal with matters enumerated in section 4 (15 USCA §§ 805–808) and to otherwise conform to the provisions and requirements of that section. The entire bituminous coal producing area of the United States, by section 4, is divided into nine minimum price areas, and further into twenty-three producing districts, each area embracing one or more producing district. Section 4 provides that the code required to be established in accordance with its terms shall be administered and enforced by the Commission, as to all matters other than labor relations between the producers and their employees, through district boards selected by each of the twenty-three districts in the manner therein provided; and as to labor relations, by the Commission through a Bituminous Coal Labor Board of three members, appointed by the President of the United States by and with the advice and consent of the Senate (15 USCA § 808 (c). Each district board, subject to the supervision and approval of the Commission, is required to immediately establish minimum prices free on board transportation facilities at the mines for all kinds, qualities, and sizes of coal produced in their respective jurisdictions, with full authority in establishing such minimum prices to make such classifications of coals and price variations as to mines and consuming market areas as it may deem necessary and proper.

It is further provided that in order to sustain stabilization of wages, working conditions, and maximum hours of labor, such minimum prices shall be established so as to yield a return per net ton for each district in its minimum price area, equal as nearly as may be to the weighed average of the total costs per net ton to be determined according to the formula attempted to be set up in said section. The district boards are further required under the rules and regulations established by the Commission and subject to the supervision and approval of the Commission, to co-ordinate in common consuming market areas upon a fair competitive basis, the minimum prices, and the rules and regulations established by them for their respective districts, and in effecting such co-ordination such district boards are required to take into account the factors set out and the rules attempted to be laid down in said section.

Said section 4 (15 USCA § 807 (c) authorizes the Commission, whenever it deems necessary in order to protect the consumer of coal against unreasonably high prices, to fix maximum prices free on board transportation facilities for coal in any district, such maximum prices to be established in accordance with the formula therein attempted to be set out.

All contracts for the sale of coal below minimum or above maximum therefor approved and established by the Commission and in effect at the time of the making of the contract are declared by such section to be invalid and unenforceable, and after the date of the approval of the act, and until the minimum prices have been established as therein provided, producers accepting the code are prohibited from making any contract for the sale of coal calling for delivery more than thirty days from the date of the contract, and code members are further prohibited, while the act is in effect, from making any contract for the sale of coal calling for delivery after the expiration of the act at a price below the minimum or above the maximum therefor approved or established by the Commission, and in effect at the time of such making.

Section 4 (15 USCA § 807 (i) further provides that the code prohibits its members from engaging in certain practices enumerated in said section as unfair methods of competition, many of which are for the purpose of compelling the producer to sell his coal to all persons similarly circumstanced at the same price.

All producers accepting and operating under the code are prohibited from interfering with or denying the right of their employees to organize and bargain collectively through representatives of their own choosing and from requiring any employee, as a condition of employment, to join a company union and from prohibiting employees from selecting their own check weighmen to inspect the weighing and measuring of coal, and from requiring as a condition of employment that their employees shall live, in company houses or trade at the store of their employer.

Section 4 (15 USCA § 808 (g) also provides that the code formulated under its terms shall provide that whenever maximum daily or weekly hours of labor are agreed upon in any contract or contracts negotiated between the producers of more than two-thirds of the annual national tonnage production of bituminous coal for the preceding calendar year, and the representatives of more than one-half of the mine workers employed, such maximum hours of labor shall be accepted by and binding upon all code members, and that any wage agreement or agreements negotiated by collective bargaining in any district, or group of two or more districts, between representatives of producers of more than two-thirds of the annual tonnage production of such district or each of such districts in a contracting group during the preceding calendar year, and representatives of the majority of the mine workers therein, shall be filed with the labor board provided for in section 4 of the act (15 USCA § 808 (c) and shall be accepted as the minimum wages for the various classifications of labor by the code members operating in such district or group of districts.

Section 5 (d) (15 USCA § 809 (d) further provides that any code member injured in his business or property by any other code member, by reason of any breach thereof or the failure to do anything which is required by the act or the code formulated thereunder, may sue for damages on account thereof in any District Court of the United States in the district in which the defendant resides or is found, or has an agent, without respect to the amount in controversy, and shall re-

cover threefold damages and the costs of the suit, including a reasonable attorney's fee.

The plaintiffs state that the Congress under the Constitution of the United States has no jurisdiction over and no power to legislate upon the matters required by section 4 of the act, and charge particularly that the fixing of minimum and maximum prices of coal free on board transportation facilities at the mines; the requirement that coal shall be sold by producers to all customers similarly circumstanced at the same price; the regulation and control of contracts for the sale of coal; and the regulations of the relations between producers and their employees in the production of coal, including the regulation and fixing of wages and hours of service as authorized in part 3 of section 4 (15 USCA § 808), are all matters not within the competency of Congress under the Constitution of the United States, and their attempted regulation by Congress is violative of the due process clause of the Fifth Amendment to the Constitution, and of the reserved rights of the states and the people, secured to them by the Tenth Amendment. Plaintiffs also state that section 4 is unconstitutional because it attempts to delegate legislative power, and that notwithstanding the lack of power of Congress to legislate on the subjects required by section 4 to be embraced in the code to be formulated thereunder, it undertook through the pretended exercise of its taxing power under the Constitution to coerce all bituminous coal producers in the United States to submit to the act, and particularly to the unconstitutional regulations and requirements under section 4 and of the code required to be formulated thereunder.

Section 5 of the act (15 USCA § 809) provides that each producer of bituminous coal accepting membership in the code shall execute and acknowledge such acceptance on a form prepared and supplied by the Commission, and further provides that the membership of any such producer in the code, and his right to drawback on the taxes levied under section 3 of the act (15 USCA § 804) subject to the right of review as provided in the act, may be revoked by the Commission upon written complaint and hearing.

Each of the plaintiffs states it does not desire to accept the provisions of section 4 of the act, and of the code, and has no intention of accepting same and of submitting itself to the jurisdiction of the Commission and the other agencies charged with the administration and enforcement of such code, nor of operating under its provisions, but desires and intends to exercise its constitutional right to conduct its business of producing and selling bituminous coal, which is a private one and not affected with a public interest, free of the unconstitutional regulations and restrictions of said act, particularly in section 4, but by reason of sections 3 and 9 (15 USCA §§ 804, 813) they are and will be penalized for failure and refusal to accept and operate under the provisions of section 4 and of the code formulated thereunder, by the imposition of a penalty, denominated as a tax in the act, equal to 15 per cent. of the sale price at the mine of the coal produced by each of them, whereas the producers who agree to operate under the provisions of section 4 and of the code are awarded by a rebate and forgiveness of 90 per cent. of the tax, or penalty, which they would otherwise be required to pay.

Plaintiffs state that sections 3 and 9 of the act (15 USCA §§ 804, 813) in so far as they purport to impose upon those producers of bituminous coal who refuse to accept and operate under the provisions of section 4 of the act, and of the code thereunder, a tax equal to 15 per cent. of the sale price at the mine of the coal produced by them is not a good faith exercise of the taxing power conferred upon Congress by clause 1 of section 8, article 1 of the Constitution of the United States, but is an unconstitutional attempt by Congress under guise of taxation to punish those producers of bituminous coal who are unwilling to surrender their constitutional right to conduct their business free of unconstitutional interference and regulation by Congress, and the attempted imposition of such penalty operates to deprive these plaintiffs of their property without due process of law.

Plaintiffs state that the average total sale value at the mines of coal produced and sold by each of them each calendar month, and the amount of penalty which the said act attempts to impose upon them, in the guise of a tax, because of their refusal to surrender their right to conduct their business free of unconstitutional in-

terference by the government, is approximately as follows:

| Name of Plaintiff | Average Total Sales Per Month | Monthly Penalty or Tax |
|---|---|---|
| R. C. Tway Coal Company | $44,000 | $ 6,600 |
| Kentucky Cardinal Coal Corp. | 20,000 | 3,000 |
| Harlan-Wallins Coal Corp. | 139,925 | 21,000 |
| Creech Coal Company | 63,000 | 9,500 |
| Harlan Central Coal Company | 18,000 | 2,700 |
| Harlan Fuel Company | 54,000 | 8,100 |
| Crummies Creek Coal Company | 68,000. | 10,000 |
| Three Point Coal Company | 33,000 | 4,900 |
| Clover Fork Coal Company | 14,000 | 2,100 |
| Harlan Collieries Company | 38,000 | 4,800 |
| High Splint Coal Company | 42,000 | 6,400 |
| Cornett-Lewis Coal Company | 42,000 | 6,300 |
| Kentucky King Coal Company | 7,000 | 1,100 |
| P V & K Coal Company | 9,416 | 1,400 |
| Green-Silvers Coal Corp. | 14,761 | 2,200 |
| Mary Helen Coal Corp. | 47,648 | 7,100 |

The plaintiffs state that the profit realized and realizable by each of them on the gross sale price of the coal produced by them each month over the cost of production, under prudent and economical operation, is not over 5 per cent., and such profit is not less than the profit realized by the producers generally in the field where plaintiffs' mines are located. They state it is, therefore, apparent that the penalty of 15 per cent. imposed on them by sections 3 and 9 of the act (15 USCA §§ 804, 813) is far in excess of the profit realized by each of them on the gross sale price of the coal produced each month, less the cost of producing same, and that if required to pay such penalty they would operate at a disastrous loss each month, which can be met only out of their capital and surplus, and the necessary and deliberately intended result of the imposition of the so-called tax is to leave them no choice, if they refuse to operate under the provisions of section 4 of the act and of the code formulated thereunder, except to either close down their operations or else to operate at such monthly loss they will quickly be rendered insolvent and unable to operate, in either of which events the act operates to destroy and confiscate their property and their investment therein. None of the plaintiffs, except the Crummies Creek Coal Company, Clover Fork Coal Company, and Harlan Collieries Company own the fee to the coal land upon which its operation is located and from which it is mining coal; but with these exceptions, are operating under a lease requiring them to pay a stipulated royalty per ton for each ton of coal mined and sold. It is also stipulated in their leases that in event the total coal mined in any one year is not sufficient at the fixed royalty rate to produce the minimum royalty fixed in their respective lease, then, in addition, the lessee must pay such further sum as is required to bring the total royalty or rental payments for the particular year involved up to the stipulated annual minimum royalty. The mining plant of each of the lessee plaintiffs is located upon land owned by its landlord, and under the terms of the lease under which it is operating, the landlord has a first lien upon all the improvements placed upon the premises by the lessee, and upon all mining equipment of any kind used in its operation, to secure the landlord in the payment of the stipulated royalty, and the lease under which each of the lessee plaintiffs is operating reserves to the landlord the right to forfeit the lease if the lessee remains in default in the payment of royalty beyond the time stipulated therein. They state that if they should close down their mines because of the imposition of this tax and their inability to operate because of it, they would still be at a heavy expense in the upkeep of their properties, and in particular in keeping same free from water. Each plaintiff states that substantially all of its capital and surplus is invested in its mine and equipment, and the only way it could possibly raise money with which to pay the penalties imposed, over a substantial period of time, is to sell its property, or, if possible, to mortgage same, which would ultimately lead to a sacrifice under foreclosure, as it would have no earnings after paying such monthly penalties, out of which to satisfy such mortgage; and each of the lessee plaintiffs states it could only mortgage its plant and equipment with the consent of the landlord, subject to the prior lien of the landlord for unpaid royalties. Each plaintiff states it would be impossible to borrow money with which to pay such so-called taxes upon the security of its property for the further reason its operating statement would disclose it could not operate its mines and pay the monthly penalties exacted by the terms of the act without sustaining a tremendous loss each month. Therefore, a statement which a careful lender of money would demand, would clearly disclose that the money loaned could only be recovered through a sale of the pledged property.

The plaintiffs state that while the so-called tax provision of the act does not be-

come effective until the first day of the third month following the date of the enactment of this act, and the monthly payments required thereunder do not become due until the first business day of the second succeeding month, yet the act imposes upon them such tremendous and unconscionable penalties for their refusal to operate under its terms, they cannot wait until the penalty or tax actually attaches, for the reason that should they do so, before their rights could be finally determined their property would be confiscated and destroyed through enforced payment while their rights were being determined. For this reason they directed their counsel to notify the defendant, to whom, as collector of internal revenue, they are required to pay the tax, that they regard the act as unconstitutional and have no intention of accepting or agreeing to operate under the provisions of section 4 thereof, or of the code formulated thereunder, and to inquire of the defendant what was his attitude with reference to its validity and his intention with reference to the collection of the so-called taxes imposed thereunder. They say that the defendant, Glenn, in response to such inquiry, stated that he regarded and intended to treat the act as constitutional, and intended to demand of each of the plaintiffs the amount of taxes assessable under its provisions as they matured, and upon their failure or refusal to pay, he would, by proper procedure, subject their property to the payment of the so-called tax.

Plaintiffs state that because each month's payment exacted by sections 3 and 9 of the act (15 USCA §§ 804, 813) will be far in excess of the profits on each month's operation, and can only be paid by a sale of their capital assets, or through a pledge of same under such conditions as would ultimately result in a sale thereof, and because of the further fact that if they should pay such so-called taxes as they accrue, it is within the power of the Commissioner of Internal Revenue, through delay in acting upon the application for refund, to prevent any suits to recover such so-called taxes until after the expiration of six months after the payment thereof, and even if they should promptly apply for a refund of the first month's so-called taxes required by the act to be paid, after same have been paid, and the Commissioner should promptly deny such application, a suit for the recovery there-

of could not be filed and an authoritative adjudication of their rights determined until the latter part of 1936, their capital and surplus will have been consumed, their property sacrificed, and they will have been rendered practically bankrupt before they can recover in a refund action the so-called taxes exacted of them by the act.

They say Congress has made no appropriation out of which and with which to pay any judgment for refund which may be ultimately secured by them, and it is therefore entirely uncertain when they would be reimbursed on account of the so-called taxes exacted of them by sections 3 and 9 of the act, even after they secure judgment for same. For all of these reasons, they state that the provision of the federal statutes which authorizes a suit for the recovery of illegally collected taxes does not afford the plaintiffs in this case a full, complete, and adequate remedy at law, and to compel them to resort to such remedy would operate to deprive them of their property without due process of law; but if they refuse to pay the illegal exactions imposed upon them by sections 3 and 9 of the act, unless protected by the exercise of the equity powers of this court, their property will be sold to satisfy such illegal exactions, and they will each be subject to the imposition of a fine of not exceeding $10,000, and the officers in charge of their business to a fine of not exceeding $10,000, or imprisonment for twelve months, or both such fine and imprisonment.

Plaintiffs pray that said act be decreed and adjudged unconstitutional and that such relief as flows to them from so holding be granted.

The defendant, in his answer, denied the material allegations of the petition, and in addition thereto affirmatively pleaded that bituminous coal is consumed in every state in the Union in generating energy for the production of light, heat, and power, and that it is used to produce approximately 45 per cent. of the total energy consumed for such purposes in the United States.

It is further alleged that this use makes such coal indispensable to the economic life, health, and comfort of the inhabitants of every state, and is vital to the national public welfare. It is stated that commercial deposits of bituminous coal within the United States are limited to twenty-three

producing areas within twenty-six states, and 70 per cent. of the total mined is in four states, and that 85 per cent. of the total produced is consumed (a) in states other than the state in which it was mined, or (b) by railroads engaged in interstate commerce; and that over 20 per cent. of the total annual production was used by interstate railroads for fuel. He further alleged that 17 per cent. of the total gross freight revenues was realized from the transportation of bituminous coal.

The defendant then states that in view of the importance of bituminous coal as a source of energy for industrial and domestic purposes, and in view of the necessity of transporting it across state lines to reach the majority of the users, it is of particular importance to the national public welfare that the distribution and marketing of bituminous coal in interstate commerce be not subjected to interruptions, dislocations, burdens, or restraints. For many years the distribution and marketing of such coal has been subject (a) to sudden unforeseeable, recurrent, and prolonged interruptions and stoppages in the shipment in interstate commerce; (b) to sudden, recurrent, and extremely wide fluctuations in the price of such coal to the consuming public, resulting in hardship and inconvenience to it in states other than the state of production, and tending directly and substantially to restrict and control the movement of coal in interstate commerce; .(c) to unfair and demoralized methods of competition throughout the industry which operate directly and substantially to burden and restrain interstate commerce in such coal. These burdens, restraints, and interruptions have operated with the effect to injure a multitude of the consumers of such coal throughout the country and cause a substantial waste of the coal resources of the nation and the bankruptcy of many coal producers, and widespread unemployment in the industry. These conditions have resulted in serious and widespread reigns of disorder and violence requiring resort by public authorities and private parties directly concerned therewith to the state and federal courts of law and equity, and necessitating the use of state militia and of federal troops to quell disorders. It is then alleged that the Congresses of the United States, since the year 1918, made or caused to be made twelve fact-finding investigations into the conditions under which bituminous coal is produced, distributed and marketed throughout the United States; and from the facts disclosed through these investigations that it is evident that the present burdens and restraints upon and interruptions to interstate commerce in bituminous coal are primarily and directly due to an abnormal and destructive competitive rivalry for markets between the several producing areas and between the producing units in the areas, and that such unbridled competition has resulted in a reduction of the mine realization price of such coal to a level frequently below the average cost of production thereof, and that 60 per cent. of the cost of producing such coal is attributable to labor going directly into its production, and that such labor cost is the principal element that is subject to appreciable adjustment, and as a direct result of such competition, wages in the bituminous coal industry have been progressively forced down to a point below subsistence levels; and that numerous controversies over wages have resulted in strikes and lockouts, and in the interruption, cessation, and dislocation of production and distribution, all of which was directly attributable to price and wage reductions, and because of the refusal of employers to bargain collectively relative thereto and to desist from various unfair labor practices. It is then alleged that in order to remove or control the aforesaid direct and substantial burdens upon and interruptions to interstate commerce in bituminous coal, it is necessary that competition between the various producing areas of such coal in the consuming markets of the several states be regulated by the elimination of unfair competitive marketing practices, by the fixing between fair and reasonable limits of the price at which said coal may be distributed in consuming markets and further by stabilizing and equalizing as between producing areas and between the producing units in the area, the wages and hours of labor of employees, and by otherwise eliminating the causes of strikes and lockouts.

It is then alleged that all of the plaintiffs are engaged in the business of producing bituminous coal for distribution and sale in interstate commerce, and in the conduct of such business are subject to federal regulation to the extent and in the manner provided by the code in section 4 of the said Bituminous Coal Conservation Act.

It is then alleged that the Bituminous Coal Conservation Act of 1935 exempts the plaintiffs from 90 per cent. of the tax imposed by said act if they file an acceptance of the code to be formulated under said act, and they would be thus exempted so long as they remain members of the code, and if their membership were revoked, such revocation would be subject to judicial review before becoming effective. It is further alleged that the acceptance of the code would not preclude or estop any acceptor from contesting the constitutionality of any code provision, or its invalidity as applied to him.

It is then alleged that the acceptance of the code to avoid the payment of 90 per cent. of the tax by any or all of the plaintiffs would not affect any of their constitutional rights, and any or all of the plaintiffs could after the acceptance of said act protect all their rights by complete administrative or judicial remedy.

It is then alleged that the payment of 10 per cent. of the tax as provided under the bill, or the acceptance of the code as provided under the act, would not cause the plaintiffs, or any of them, any injury, irreparable or otherwise.

It is then alleged that the plaintiffs have voluntarily and arbitrarily refused to file their acceptance of the code referred to, and under such circumstances none of them are entitled to the relief prayed for in their petition.

It is then alleged that the bill of complaint of the plaintiffs is premature, since no tax is yet in effect.

It is then alleged that the court is without jurisdiction to grant the relief prayed for in the original petition because it seeks an injunction to restrain the collection of a tax, which is prohibited under section 3224 of the Revised Statutes of the United States, USCA title 26, section 154.

The second suit is an action (Equity No. 997) instituted by C. H. Clark, a citizen of the commonwealth of Kentucky, residing at Louisville in the Western District, a stockholder and a member of the board of directors of the defendant corporation, the R. C. Tway Coal Company. This defendant is one of the plaintiffs in action No. 996. It is alleged in the bill that it is engaged in the business of mining and producing bituminous coal from its mines located in Harlan county, Ky., and selling the coal so produced. Its affairs are conducted by a board of directors elected by the stockholders. R. C. Tway and L. A. Shafer are made parties defendant, and it is stated that each of them is a stockholder and director, and together with the plaintiff constitute the board of directors of the defendant corporation.

It is alleged that the suit is in equity, is of a civil nature, arising under the Constitution and laws of the United States, and involves the validity, construction, application, and enforcement of the act of Congress approved August 30, 1935, known as the "Bituminous Coal Conservation Act of 1935" (15 USCA § 801 et seq.). The collusiveness of the action is denied, and it is alleged that the matter in controversy exceeds the sum of $3,000.

It is further alleged that the act referred to recognizes and declares that the mining of bituminous coal and its distribution by the producers thereof in and throughout the United States are affected with a national public interest, and that the general welfare of the nation requires that the bituminous coal industry shall be regulated as provided in the act referred to in the petition, and that the production of such coal and its distribution directly bear upon and directly affect interstate commerce.

The plaintiff then sets out the provisions of the act in detail, including the provision for the imposition of a monthly tax of 15 per cent. of the sale price at the mine when removed therefrom; if the defendant fails to accept the code referred to in the act. He then sets out that the Congress has the constitutional power to provide for all the things directed to be done in the regulation of the bituminous coal business as provided in the act.

The plaintiff then alleges that notwithstanding the validity of the regulatory act, that the majority of the board of directors of the corporate defendant, prior to September 10, 1935, over his protest and contrary to his wishes, concluded that the act of Congress referred to was unconstitutional and that the defendant would not comply with any of its terms, and immediately after the action of said board of directors, he requested the board in writing to reconsider its action, to accept the provisions of the act, sign the code as provided, and in response to his demand the board of directors of the corporation held a special meeting, and at said meeting,

580

over his protest, reaffirmed their former action and spread on the minutes of the meeting a resolution to not comply with any provisions of said act because of its unconstitutionality.

Plaintiff then states that a special meeting of the stockholders of the corporate defendant was held, and he appealed to them to accept the provisions of the act referred to, and over his protest the stockholders of the corporate defendant, excluding himself, unanimously voted to not accept the provisions of said act or any part thereof, and by resolution duly spread on the minutes of the meeting so declared.

Plaintiff states that by reason of the corporate defendant refusing to accept the provisions of the Bituminous Coal Code that it subjects itself to a tax of 15 per cent. on the sale price of the coal mined and produced by it, as provided by section 3 of the act (15 USCA § 804) and that the profit realized by the corporate defendant for many years past and at the present time, and as he believes, in the future, will not be in excess of 5 per cent. of the sale price of the coal mined and sold, and that the tax of 15 per cent. imposed upon the corporate defendant for its failure to accept the code will have to be paid out of its capital assets, which will result in a disastrous loss to the company and ultimately lead to its bankruptcy and the entire loss and destruction of the value of plaintiff's stock in the corporate defendant.

He further states that under the provisions of the act, the corporate defendant is subject to a fine not exceeding $10,000 for each failure to report and pay the taxes provided in said act, and the imposition of fines on the corporate defendant will also deplete the assets of said defendant, which would reduce the value of the stockholders' shares in said company.

Plaintiff states that in view of the facts alleged in the petition, it is the duty of the corporate defendant, in the proper performance of its corporate functions, to accept and operate under all the provisions of the Bituminous Coal Code, and that it is the duty of the individual defendants, Tway and Shafer, to join with the plaintiff, as directors of the corporate defendant, to cause it to accept the said code and operate under its provisions, and that their failure to do so will work irreparable damage and injury to the corporate defendant, and to the plaintiff and stockholders, and

that he is without remedy, except in this court sitting as a court of equity.

Plaintiff asks the court to adjudge that it is the duty of the corporate defendant, and its officers and directors, to accept the provisions of the act of Congress, approved August 30, 1935, known as the "Bituminous Coal Conservation Act," and use its equity powers to compel the corporate defendant and its officers to take all steps necessary to comply with said act.

The plaintiff invited the District Attorney for the Western district of Kentucky to appear in the proceeding instituted by him, and aid and assist him and his attorneys in sustaining the constitutionality of the act referred to in the petition, and the District Attorney filed a brief amicus curiæ.

The plaintiff and defendants filed a stipulation in the action, in which it was stipulated and agreed that if the matters dealt with in section 4 of the Bituminous Coal Code and the provisions set out in part 3 of said section (15 USCA § 808) were matters within the competency of Congress under the Constitution, and if Congress had the power to impose the 15 per cent. tax on the producers who refuse to accept and operate under the code provided under section 4 and to exempt producers accepting the provisions of the code from payment of 90 per cent. of such tax, it would be an abuse of the corporate functions of the company and of the powers vested in the directors to conduct the affairs of the corporation, to refuse to accept said code and operate thereunder because of the additional burden of taxation on the corporation.

It was stipulated that the plaintiff was authorized to invite the Department of Justice of the United States, and the United States' Attorney for the Western district of Kentucky to appear and defend the constitutionality of the Bituminous Coal Conservation Act of 1935, but this consent was not to be construed as an agreement that the invited parties should control the progress of the action or unduly delay its decision by the court.

A supplemental stipulation was filed, in which the parties stipulated that bituminous coal was used in generating energy for light, heat, and power in all parts of the United States, and that substantially 45 per cent. of the total energy used in the United States was produced from the use of such coal.

It was further stipulated that 86 per cent. of such coal was transported in interstate commerce from the place of production to destination by rail, and that only 14 per cent. of such coal was consumed in the state where produced. It was also stipulated that 18 per cent. of the gross freight revenues of the railroads engaged in interstate commerce was realized from the transportation of bituminous coal, and that approximately 20 per cent. of the total annual production of bituminous coal in the United States was used for fuel by railroads engaged in interstate commerce.

It was further stipulated that approximately 450,000 men were employed in the United States in the mining of bituminous coal, and that approximately 60 per cent. of the cost of producing such coal was represented by wages paid to them.

It was further stipulated that the United States District Attorney for the Western district of Kentucky had been invited to appear in said cause and present any additional facts which he deemed pertinent to a decision of said cause, but that said attorney had not offered or produced any evidence.

The defendants, after admitting the right of the plaintiff to maintain this action, moved its dismissal for the following reasons:

"1. Because Congress, under the Constitution of the United States, has no jurisdiction over and no power to legislate upon the matters required by section 4 of the Act to be embraced in the Bituminous Coal Code therein required to be formulated, and particularly because the fixing of minimum and maximum prices of coal free on board transportation facilities at the mines; the requirement that coal shall be sold by producers to all customers similarly circumstanced at the same price; the regulation and control of contracts for the sale of coal; and the regulation of the relations between producers and their employees in the production of coal, including the regulation and fixing of wages and hours of service, as authorized in part III of section 4, are each and all matters not within the competency of Congress, under the Constitution of the United States, and the attempted regulation by Congress of the above enumerated matters is violative of the due process clause of the Fifth Amendment to the Constitution of the United States, and of the reserved rights of the States and the people, secured to them by the Tenth Amendment thereof.

"2. Because sections 3 and 9 of the Act, insofar as they purport to impose upon those producers of bituminous coal who refuse to accept and operate under the provisions of section 4 of the Act, and of the code formulated thereunder, a tax equal to fifteen per cent of the sale price at the mine of the coal produced by them, is not a good faith exercise of the taxing power conferred upon Congress by clause 1, section 8, article 1, of the Constitution of the United States, but is an unconstitutional attempt on the part of Congress, under the guise of taxation, to coerce all producers of bituminous coal into accepting and operating under the Bituminous Coal Code provided for by section 4 of the Act, and to punish those producers of bituminous coal who are unwilling to surrender their constitutional right to conduct their business free of unconstitutional interference and regulation by Congress; and the imposition of such penalty operates to deprive producers who refuse to accept the provisions of the code of their property without due process of law, in violation of the Fifth Amendment, and is an unconstitutional invasion of the rights of such producers, reserved to them by the Tenth Amendment to the Constitution of the United States.

"3. Because section 4 of the Act undertakes to delegate legislative power to the National Bituminous Coal Commission, and to the other agencies created by the Act.

"4. Because the tax attempted to be imposed upon those producers who refuse to accept and operate under the provisions of the code required to be formulated under section 4 of the Act is arbitrary, capricious and confiscatory, and was deliberately intended by Congress to be confiscatory."

Equity No. 808 is a petition filed by John N. Mackall and Sterling S. Lanier, Jr., this court's receivers appointed in the case of Baltimore Trust Company v. Norton Coal Mining Company, engaged in the business of operating coal properties in the Western Kentucky coal field, and in producing and marketing bituminous coal. The petitioners, after setting out their operating losses and the impossibility of paying a tax of 15 per cent. on the sale price per ton on the coal mined, alleged substan-

tially the same facts as stated by the plaintiffs in action No. 996, and in defendants' answer in that same action, and further said they were unable to decide what course of action they should pursue under said facts and their unwillingness to assume responsibility for a decision, and requested the court to advise them as to whether or not they should ignore said act or comply with its provisions.

All of these actions have been submitted to the court for final decision.

■ The parties to actions No. 996 and No. 997 have filed stipulations of fact and introduced oral testimony concerning factual matters considered by the Congress in passing the legislation which it is now claimed is unconstitutional. Their reason for seeking the aid of testimony in passing on the congressional power to legislate on this subject is said to be supported by the opinion of the Supreme Court in Borden's Farm Products Co. v. Baldwin, 293 U. S. 194, 213, 55 S. Ct. 187, 79 L. Ed. 281. An examination of this case shows that the matter before the court was the validity of a statute of the state of New York, referred to as the "New York Milk Control Law" of April 10, 1933, authorizing the Milk Control Board to fix minimum prices for sales of fluid milk in bottles by milk dealers to stores in a city of more than 1,000,000 inhabitants, establishing a differential of 1 cent a quart in favor of dealers not having a well-advertised tradename.

The court in that case said that where a legislative action is suitably challenged, and a rational basis for it is predicated upon the particular economic facts of a given trade or industry, which are outside the sphere of judicial notice, these facts are properly the subject of evidence and findings, and the Supreme Court sent the case back to the lower court for a final hearing upon pleadings and proof, with directions that the facts should be found and conclusions of law stated as required by Equity Rule 70½ (28 USCA following section 723).

This case turned on the administration of the act in the construction that the Milk Control Board had placed on the phrase "well advertised trade name," and its application to the appellant. It did not involve, except indirectly, the constitutionality of the act under which the Milk Control Board made its classification.

I have followed the wishes of counsel in putting into the record factual matters as far as it is concerned, but in writing this opinion I have assumed that this court is without power to hear evidence or find facts upon the constitutionality of the congressional act here in question.

Where a proceeding directly attacks an act of Congress, as unconstitutional as contradistinguished from constitutional rights being invaded by the administration of the act, it seems to me a court would be treading on dangerous ground to attempt to go into a factual field in determining its constitutionality. The effect of evidence in such proceeding is, of course, a collateral attack upon the legislative inquiry, judgment, and declaration (that is to impeach it).

The Congress has already investigated the facts as a basis for its action. If its findings may be impeached by the testimony of opinion witnesses, the act might be found to be constitutional in one case and unconstitutional in another, depending on the testimony. As many conclusions might be reached as to constitutionality as there might be judges, or upon such facts as ingenuity might suggest as matters of opinion or actual facts in evidence.

■ The courts, so long as they recognize the doctrine of separation of governmental powers, which is fundamental under our system, will not attempt to exercise the power of another branch. Judges will be careful to observe the ideal expressed by the letter and spirit of the Constitution to avoid encroachment upon other departments, and will be quick to sustain each in the exercise of its legitimate function, and so the rule prevails that every inquiry into the validity of a legislative act is approached with the presumption that the Congress observed the Constitution, and when the validity of an act depends upon the existence of certain facts, the legislative determination will be conclusive on the courts, unless the contrary is shown by facts which the court may judicially notice. If it cannot be made to appear that a law is in conflict with the Constitution by argument deduced from the language of the law itself, or from matters of which the court can take judicial notice, then the act must stand. Soon Hing v. Crowley, 113 U. S. 703, 711, 5 S. Ct. 730, 28 L. Ed. 1145; Minnesota v. Barber, 136 U. S. 313, 320, 10 S. Ct. 862, 34 L. Ed. 455; New Orleans v. Warner, 175 U. S. 120, 20 S. Ct.

44, 44 L. Ed. 96; Angle v. Chicago, etc., R. Co., 151 U. S. 1, 27, 14 S. Ct. 240, 38 L. Ed. 55.

The following fact-finding investigations into the conditions under which bituminous coal is produced, distributed, and marketed throughout the United States have been held or authorized by Congress: Hearings before the Committee on Manufactures of the Senate on Shortage of Coal (65th Cong., 2d Sess., 1918); Hearings before the Committee on Interstate Commerce of the Senate on Increased Price of Coal (66th Cong., 1st Sess., 1919, 1920, 1921); Hearings before the Committee on Reconstruction and Production of the Senate on Coal and Transportation (66th Cong., 3d Sess., 1920, 1921); Hearings before the Committee on Education and Labor of the Senate on Conditions in the West Virginia Coal Fields (67th Cong., 1st Sess., 1921, 1922); Hearings before the Committee on Labor of the House of Representatives on Labor Conditions in the Coal Industry (67th Cong., 2d Sess., 1922); Report of the United States Coal Commission pursuant to the Act of September 22, 1922, published in 1925; Hearings before the Committee on Interstate and Foreign Commerce of the House of Representatives on Coal Legislation (69th Cong., 1st Sess., 1926); Hearings before the Committee on Interstate Commerce of the Senate on Conditions in the Coal Fields of Pennsylvania, West Virginia and Ohio (70th Cong., 1st Sess., 1928); Hearings before the Committee on Interstate Commerce of the Senate on Proposed Bituminous Coal Legislation (70th Cong., 2d Sess., 1929); Hearings before the Committee on Mines and Mining of the Senate on the Creation of Bituminous Coal Commission (72d Cong., 1st Sess., 1932); Hearings before the Committee on Interstate Commerce of the Senate on Stabilization of the Bituminous Coal Mining Industry (74th Cong., 1st Sess., 1935); Hearings before the Committee on Ways and Means of the House of Representatives on Stabilization of the Bituminous Coal Mining Industry (74th Cong., 1st Sess., 1935).

All of the ultimate facts shown in these reports are presumed to have been considered by the Congress before the passage of the act in question, and this court may consider them as well as all other facts of which it may take judicial notice in passing on the validity of this act.

Board of Trade v. Olsen, 262 U. S. 1, 43, 43 S. Ct. 470, 67 L. Ed. 839.

Based on these reports and matters of common knowledge, the following facts were before the Congress at the time of the passage of the act here involved:

More important than winds and water for the production of power and of heat is coal mining of all kinds. Mechanical transportation, manufacturing, and domestic heating all largely depend upon coal. Water power and oil have in a recent age relieved somewhat the burden upon coal, but it still is, and will long continue to be, the principal source of energy in the United States. It is the most valuable mineral in all the world. It is, with oil, one of the twins of black gold. The utilization of coal awaited the development of the steam engine, but when James Watt developed the latter, it, together with coal, brought on an industrial revolution which changed the course of history and the life of mankind.

Coal not only heats our homes and public buildings, provides power for railroads and steamships, and keeps alive the great furnaces that transform iron ore into pig iron, but it enters into everyday living in many ways, for coke, gas, ammonia, and tar are all derived from coal, and they in turn have derivatives that are now considered indispensable to modern civilization. Sixty-three valuable chemical by-products are obtained from coal. This mineral is an indispensable requisite to our continued progress.

The production of bituminous coal by states, in millions of tons per annum, is approximately as follows: Pennsylvania 140, West Virginia 124, Illinois 68, Kentucky 54, Ohio 29, Indiana 22, Alabama 22, Virginia 12. Twenty other states produce bituminous coal in small quantities, but the eight states above mentioned produce the major part. All of the states of the Union use bituminous coal in large quantities, and it is the principal article in freight tonnage moved by interstate railroads. It is the largest single source of gross freight revenue to these roads, and is also the principal source of power.

The paramount importance of the bituminous coal mining industry in the economic and social life of this country cannot be denied. With the exception of agriculture, it employs more men than any other single industry in the United States. It

is the foundation of our iron and steel, shipbuilding, and engineering trades, and, indeed, of our whole industrial life.

The industry has a human as well as a technical side. The risk and uncertainties of mining, the importance of the industry, and the national welfare combine to make the life of the miner a matter of public concern.

From the days of the Molly Maguires in 1875, to the present time, the bituminous industry has been the theater of unrest which constantly gives rise to stoppages of work in the industry and occasionally develops into labor disputes on a national scale. The announcement of strikes is sometimes made long in advance of the contemplated event, and large sums of working capital of railroads engaged in interstate commerce, and manufacturers producing products entering into such commerce are invested in reserve supplies of coal, and the storage thereof displaces other necessary appliances and utensils used by the carrier, and the product of the manufacturer, and in addition adds to the burden of both the carrier and the manufacturer by the use of unnecessary capital.

The miners seek to make a wage scale applying to producing coal areas in more than one state, and the scale of wages in one state affects the production and movement of coal in another state with a different wage scale.

Mining is recognized as one of the most hazardous occupations of man, and it has exacted its toll in thousands of deaths and many more injuries in comparatively few years. New methods of extraction, and the use of labor saving appliances have greatly increased the output in tons per man. Most of the coal reserves of the United States in production are located where mining is the only gainful occupation, and when slack work comes, those thrown out of employment can find no other occupation in which subsistence may be had. The high number per thousand of population on the relief rolls in the mining areas of the United States compared with the other sections of the country is impressive testimony of the vital interest the government has in the rehabilitation and stabilization of the coal industry.

No other industry in the United States has had the prolonged intimate and painstaking study of its conditions as the bituminous coal industry. The Fuel Produc-

tion Committee of 1917, the Fuel Administrator from 1917 to 1919, the Bituminous Coal Commission of 1921, the Federal Fact Finding Commission, not to mention the various congressional and state legislative committees, have all examined the ills of the mining industry and fully reported on them. The average earnings of the miner have been in constant decline since 1922, and generally have not been sufficient to maintain him and his family above the recognized line of subsistence. For more than ten years this industry has been in chaos. There have been misunderstandings without number between the operator and the miner. No other industry has caused so much public anxiety, and the disorders in it have vitally affected the interstate steam transportation system of the country and its repercussions have been felt in other industries.

The operators and owners of mines, shortly after the close of the war, fell upon hard times and profits practically vanished. It was not possible to lower freight rates affecting the industry. The only place where the cost of production could be decreased was in wages, and thus came a period, which still continues, of lower standards of living for the miners, and the loss of an economic wage.

The business of coal mining, that is to say bringing coal from the seam to the surface and preparing it for sale by screening or washing, is not carried on in isolation from other businesses. It is usually sold to be transported in interstate commerce before mining is commenced, and the production thereof is closely associated with its utilization in other industries, not only using it for the production of power, but also its by-products in the manufacture of many articles that are absolutely essential to the comfort and convenience of the American people.

The production of bituminous coal was greatly expanded during the period of the late war, and at the conclusion of peace, the mining area had been increased far beyond the needs of consumers, and capital invested in the business became frozen. The difficulties of the industry were further increased by the substitution of oil, natural gas, and water power for the production of energy. Bankruptcies of concerns engaged in the business have clogged the court dockets, and it has been a prolific source of equity receiverships. Reorganizations authorized under the amend-

ed bankruptcy acts have been of no substantial benefit to the coal industry. The Norton Coal Company, heretofore referred to in this opinion, has been in receivership in this court for an undue period, and it is impossible to find a purchaser for its properties at any substantial price, although at one time it was a highly profitable concern and now owns a large acreage of bituminous coal readily accessible for mining. The unfavorable condition in the coal industry, due to overproduction and overcapitalization, has led to many unfair trade practices. An illustration of some of them is what is usually referred to as "distress coal," which is the production of different sizes of coal for which there is no market in order to obtain a marketable size. Because of a lack of storage facilities at the mines, the distress coal is placed on cars at the producers' tracks, which become so congested that production must be stopped or cars moved, which is done by sending the unsold cars to billing points on consignment, which depresses the price of other coal at the point of consigned destination. Often distress coal is not marketable at any price after being shipped on consignment. Demurrage charges accumulate on standing cars, and interstate transportation facilities are thrown out of movable use. "Pyramiding" of coal is another unfair trade practice, which occurs when a producer authorizes several persons to sell the same coal, and they in turn offer it to other dealers, which causes the coal to compete with itself in the market, resulting in abnormal and destructive competition.

Other unfair trade practices could be cited, but these are sufficient to illustrate the point.

The bituminous coal fields of the United States in production are widely separated. The greater part of them are in the Eastern and Middle States. The West Coast must depend for its supply on long stretches of interstate or water transportation.

It may be said that if the supply of bituminous coal were suddenly cut off, many manufacturing plants would shut down, trains stop, and steamships be helpless.

It is claimed by the defendant in action No. 996, that it is premature because the tax or penalty which the plaintiffs claim they will be required to pay is not assessable or due until January, 1936, and on the further ground that before the defendant, as collector, has any authority to collect these taxes or penalties, they must first be assessed by the Commissioner of Internal Revenue.

While the taxes are not payable until January, 1936, they are determined on a basis of coal mined after November 1, 1935, and prudent business management would require each of the plaintiffs to begin maintaining a reserve for the taxes as they accrue. The sums due would enter into the cost of coal produced, and if the act here in question is constitutional and the plaintiffs resist it and refuse to comply with its terms, each would add the tax to the cost of coal produced if a market could be found with the addition.

It is provided in section 7 of the act (15 USCA § 811) that all the provisions of the law, including penalties and refunds relating to the collection and disposition of internal revenue taxes, shall, in so far as applicable and not inconsistent, be applied to taxes imposed under the act.

Rev. St. § 3164, as amended, USCA 26, § 26, provides it shall be the duty of every collector of internal revenue having knowledge of any willful violation of any law of the United States relating to the revenue, within thirty days of the coming into possession of such knowledge to file with the District Attorney of the district in which any fine, penalty, or forfeiture may be incurred, a statement of all the facts and circumstances of the case within his knowledge.

Under the provisions of Rev. St. § 838, USCA 28, section 486, it is made the duty of the District Attorney to collect the fine or penalty reported to him by the collector. Various other provisions of the Internal Revenue Law, unnecessary to cite here, require the collector to diligently inquire into all tax delinquencies and take prompt action to assess and collect all taxes found to be due and unpaid in his district.

A court of equity acts before injury is done. All that is necessary to determine is the impending damage. This action is not premature. Pierce v. Society of Sisters, 268 U. S. 510, 45 S. Ct. 571, 69 L. Ed. 1070, 39 A. L. R. 468; Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822; Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U. S. 249, 251, 53 S. Ct. 345, 77 L. Ed. 730, 87 A. L. R. 1191; Vicksburg

Waterworks Co. v. Vicksburg, 185 U. S. 65, 22 S. Ct. 585, 46 L. Ed. 808; United States v. Murphy (D. C.) 264 F. 842, 843; Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; City Bank Farmers' Trust Co. v. Schnader, 291 U. S. 24, 54 S. Ct. 259, 78 L. Ed. 628.

■ It is also contended by the defendant that section 3224 of the Revised Statutes, 26 USCA § 154, prevents this court from issuing an injunction against the defendant, although all the facts alleged in plaintiffs' petition are true. It is provided in this section that no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court. It has been many times decided that this statute is inapplicable if extraordinary circumstances exist bringing the case within the acknowledged head of equity jurisdiction, and it is prohibitive of this proceeding unless such extraordinary circumstances have been shown.

The plaintiffs have introduced evidence as to each of them sustaining the allegations of the petition that they are wholly unable to continue in business if compelled to pay 15 per cent. of the sale price per ton on all the coal produced and mined by them. The defendant responds to this contention by pointing out that the payment of 1½ per cent. of the sale price per ton on coal mined would be no burden, and the plaintiffs admit this sum in taxes could be borne by each of them without hardship, but insist that they, and each of them, are entitled to have the constitutionality of the act involved determined by the courts of the land before being compelled to accept its terms.

It was the undoubted purpose of the Congress in providing for the fifteen per cent. per ton tax to use it as a weapon to force persons within the terms of the act to accept its provisions, and thereafter afford them the remedy of contesting the matter in court. It, therefore, comes to the question of whether or not the plaintiffs would lose any substantial rights by accepting the code. If any one of them would lose either money or a substantial property right by the payment of the tax of 1½ per cent. and acceptance of the code, then section 3224, Rev. St. is not applicable under the principle laid down in Hill v. Wallace, supra; and the plaintiffs would be entitled to the relief, as decreed in the case of Miller v. Nut Margarine

Company, 284 U. S. 498, 52 S. Ct. 260. 76 L. Ed. 422.

■ As heretofore pointed out, the only provision for refund of taxes under this act is by reference to other provisions of the law for the refundment of Internal Revenue taxes. Four different statutory provisions are found for refundment, as follows: 26 USCA § 149, Rev. St. § 3220, as amended; 26 USCA § 1065, 43 Stat. 1115; 26 USCA 1120, 44 Stat. 84; 7 USCA § 615, 48 Stat. 973. These sections have varying periods of limitation, and one of them provides that the taxpayer shall show satisfactory evidence that he has not passed the tax on to the consumer. It will thus be seen there is an uncertainty in the law as to what particular refunding statute the plaintiffs should follow in making application for refund.

It is provided in section 3 of the act (15 USCA § 804) here in question, "no producer shall by reason of his acceptance of the code provided for in Section 4 [sections 805, 806, 807 and 808 of this chapter] or of the drawback of taxes provided in Section 3 of this Act [this section] be held to be precluded or estopped from contesting the constitutionality of any provision of said code, or its validity as applicable to such producer." It will be noted that this provision of the statute provides only the waiver specifically to the code provisions of the act and no others. It is not as broad a provision of waiver of estoppel by the government as would seem without close examination.

If a producer accepts the act until the constitutionality of the code provisions are settled in court, he is subjected to its provisions as to prices, wage scale, and prohibited from following certain trade practices which otherwise might not be unlawful. From these things he might sustain a substantial loss for which no recovery is provided in the act.

It would be a senseless sort of procedure to say that he could accept the provisions of the act, and simultaneously therewith file suit in court to test its constitutionality. Rev. St. § 3224 is not applicable to this suit.

■ This section should not be extended by implication. The courts are better equipped to construe acts of the Congress than administrative officers. The judge is identified, and trained in construing statutes. His hearings are conducted in public, and

his judgment is determined by the impartial application of principles which are known and established. All persons to the controversy are fully and fairly heard. In other words, the decision of a court is in every important respect sharply contrasted with administrative conclusions, however benevolent the executive administrator may be.

Prompt judicial determination of the constitutionality of an act leads to its quick acceptance by those to whom applicable. Delay of determination through administrative process makes uncertain the rights of the citizen and difficult administration of the law.

■ The District Attorney and the Attorney General's office filed a brief amicus curiæ in action No. 997, and insisted that this court had no jurisdiction because there was no case or controversy between the parties, and, further, the constitutionality of the act could not be properly decided due to the lack of evidence.

As was heretofore pointed out in the statement of the case, it was alleged in the petition that the action was not collusive. The District Attorney and the Attorney General were invited to come into the case and tender any evidence germane to the question. This invitation was declined. Lack of good faith on the part of litigants to a lawsuit cannot be raised by an amicus curiæ. If the record fails to show collusion between the parties, such friend of the court must take the record as he finds it.

■ The District Attorney and the collector of internal revenue were proper, but not necessary, parties to this action. The court would have permitted either of them to become parties had they so desired, and as such, of course, they could have produced any evidence showing collusiveness to oust the court of jurisdiction that they wished, and it was their duty to have raised the question in that form rather than by collateral interjection.

■ There is nothing in the record to show collusion. The court is not ready to assume that any officer of a company coming under the provisions of the act here in question would not wish to comply with its terms. According to the public press, many of the producers of bituminous coal, in fact the majority of them, have accepted this act.

■ There is also nothing to show that the plaintiff, C. H. Clark, is not prosecuting his action in good faith. This court has jurisdiction of the action. In re Reisenberg, 208 U. S. 90, 28 S. Ct. 219, 52 L. Ed. 403; Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822; Brushaber v. Union Pacific R. Co., 240 U. S. 1, 36 S. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713; Pollock v. Farmers' Loan & Trust Co., 157 U. S. 429, 15 S. Ct. 673, 39 L. Ed. 759; Smith v. Kansas City Title & Trust Co., 255 U. S. 180, 41 S. Ct. 243, 65 L. Ed. 577; Cotting v. Godard, 183 U. S. 79, 22 S. Ct. 30, 46 L. Ed. 92; Dodge v. Woolsey, 18 How. 331, 15 L. Ed. 401; Dickerman v. Northern Trust Co., 176 U. S. 181, 20 S. Ct. 311, 44 L. Ed. 423; Harris v. Brown (D. C.) 6 F.(2d) 922; Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U. S. 518, 48 S. Ct. 404, 72 L. Ed. 681, 57 A. L. R. 426; Blair v. Chicago, 201 U. S. 400, 26 S. Ct. 427, 50 L. Ed. 801; May Hosiery Mills v. United States District Court (C. C. A.) 64 F. (2d) 450.

As we have heretofore pointed out, we do not believe the court is authorized to receive evidence to aid it in determining the constitutionality of the act involved, and for that reason the second point raised by the amicus curiæ is without merit. Action No. 997 presents both a cause of action and a justiciable controversy.

In view of the conclusions I have heretofore expressed, it now becomes my duty to pass on the constitutionality of the act. Its opponents attack it broadly on the following grounds:

1. Because it violates the due process clause of the Fifth Amendment to the Constitution, and the reserve rights of the states and the people under the Tenth Amendment.

2. Because it confers legislative power on the National Bituminous Coal Commission and other agencies created by the act.

■ There are two approaches to the determination of the constitutionality of a statute. One is to measure it by the decisions of the Supreme Court on acts somewhat similar to the one under consideration; and the other, to directly test it by the provisions of the Constitution, regardless of any decisions of the Supreme Court.

The latter course should be pursued first in every case, because each act involves a different subject-matter from any previous one. In Schechter Poultry Corp. v. United States, 295 U. S. 495, 546, 55 S. Ct. 837, 850, 79 L. Ed. 1570, 97 A. L. R. 947, the court said: "In determining how far the federal government may go in controlling intrastate transactions upon the ground they 'affect' interstate commerce, there is a necessary and well-established distinction between direct and indirect effects. The precise line can be drawn only as individual cases arise, but the distinction is clear in principle."

Unless this distinction is kept in mind, the consideration of the decisions of the Supreme Court will only lead to confusion.

Many acts involving interstate commerce are somewhat similar to the Bituminous Conservation Act, but the relationship is only fragmentary. The Supreme Court has been careful to state, in many cases, that its decision is only applicable to the particular act under consideration. The court is committed to the doctrine that the Constitution is a live and vital instrument, and is not static. It speaks of the age when written, more than a hundred years ago. The court expounds it in the language of its own age, holding fast to the old words and powers, but expounding them to keep pace with the expansion of our country, its citizens, its enterprises and industries, and our rapidly growing civilization.

■ The act here in question is not to be tested by the court's decision on some previous act, which was identical with a part of this one. The whole is the sum of all the parts, but the affinity of the parts is not the affinity of the whole. Many illustrations of this are found in chemistry. Cotton and nitric acid, widely used commodities, separately are not dangerous, but when joined to form gun cotton, a deadly explosive is produced. Glycerine, a part of almost every soap used in every household, is a harmless product. Nitric acid, when used alone, is harmless, but when combined with glycerine produces nitro-glycerine, a powerful, deadly force. So it is in the business and economic world. Things standing alone do not affect the happiness or welfare of the people, but when combined produce political and social disaster. Keeping this principle in mind, the mining of coal alone may not affect interstate commerce, but combined with the work of the miner, the transportation and marketing thereof may become interstate commerce in its entirety.

The Constitution of the United States stands alone, and decisions of the courts interpreting it do not alter it. In testing any act of Congress by the terms of that instrument, a sensible and logical thing to do is to immediately go to the language of the document and to measure the act in question by the basic rules of interpretation and not the decisions of the Supreme Court on some similar, but not related, act to the one in question.

After this is done, then the decisions of the court on similar acts will be helpful in testing the conclusion reached from the first investigation.

The Constitution of the United States was ordained among other purposes to promote the general welfare, and one of the methods for so doing, as provided in section 8, art. 1, cl. 3, was to regulate commerce with foreign nations and among the several states, and with the Indian Tribes, and in order to make certain that this could be done, it empowered the Congress to make all laws which should be necessary and proper for carrying into execution the power specifically conferred, and all others vested by the Constitution in the government of the United States, or any department or officer thereof (clause 18).

■ The most helpful rule for interpreting the Constitution is to look to the history of the times and examine the state of things existing when it was formed, and adopted. In applying this rule, we may look to conditions at the time of its adoption, the general spirit of the times, and the prevailing sentiment among the people. In doing this, reference may be made to historical facts and prior well-known practices and usages. Legal Tender Cases, 12 Wall. 457, 20 L. Ed. 287; Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Rhode Island v. Massachusetts, 12 Pet. 657, 9 L. Ed. 1233; Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394; Maxwell v. Dow, 176 U. S. 581, 20 S. Ct. 448, 494, 44 L. Ed. 597.

The first effort of our people, after wining the War of Independence, to have a united government was by Articles of Confederation adopted in 1777. After ten years of government under this instrument, it was found that if the great purposes for

which independence was sought were to survive and the nation grow, the states must surrender to a central government certain powers they had, and in response to the people's demand, the Constitution of the United States was adopted in 1787.

█ It is clear from a consideration of the history of the times, the adoption of the Constitution, and the objects to be accomplished, that the people of the states intended to surrender all the rights they had to promote the general welfare that could not be done by the states acting independently. If this broad purpose is kept in mind, dictionary definitions of words will be less potent in interpreting the Constitution, and there will be less case matching when courts are called on to perform this duty.

█ The Congress should first determine if the act proposed is in the interest of the public welfare; second, can the states acting independently accomplish the result; third, if not, should the central government take action; and fourth, search the Constitution for authority to carry into statutory form the demand of the people for governmental action. If state action is impotent, federal action is imperative if public necessities demand.

█ The facts, as heretofore shown, clearly prove that the states acting alone are unable to rehabilitate the Bituminous Coal Mining Industry as it affects the people generally, the capital invested in the business, and the wage earner employed therein. Joint action of the states is imperative. The Congress should exercise whatever power it has, and, if possible, the courts should avoid constitutional barriers thereto.

Disordered commerce among the states contributed largely to the fall of the original confederacy. It was soon found it was idle and visionary to suppose that the government of the United States could continue to exist if the states retained the power to regulate commerce among them.

Washington, before the Convention met to adopt the Constitution, referring to the necessity of power to regulate commerce being lodged in the central government, said: "If the States individually attempt to regulate commerce, an abortion, or a many-headed monster would be the issue. If we consider ourselves, or wish to be considered by others, as a united people, why not adopt the measures which are characteristic of it and support the honor and dignity of one? If we are afraid to trust one another under qualified powers, there is an end of the union." Rives' Madison, p. 60.

█ The Constitution is an enumeration of powers and contains no definitions. The defining is left to the Congress, and if its definition is without basis in fact, the courts may negatively disregard the Congressional definition.

█ It does no violence to the Constitution to say the power to regulate commerce among the states gives Congress the power to regulate that which regulates interstate commerce.

If a mass of things directly affect interstate commerce, it would seem within the realm of reason that Congress could take hold of any part of the mass when it began to move to the union of the whole.

When the coal operator contracts his coal in advance of production, to be transported in interstate commerce, and the miner begins to dig the coal and lift it to the surface of the earth, there to be put in the car on the loading tracks and a part of it to be used to move the locomotive that carries the coal, it would seem reasonable that under the power to regulate commerce the Congress would have power to legislate concerning the industry at the beginning of the movement that was to continue uninterrupted until ultimate delivery to a consumer or purchaser. Unless this be so, congressional power to regulate commerce is confined exclusively to the vehicle that moves the product.

With these general observations, we now turn to the decisions of the Supreme Court as to what so affects interstate commerce as to authorize legislative action.

In Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 403, 66 L. Ed. 735, 23 A. L. R. 229, the court said: "Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and meet it."

In Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 477, 67 L. Ed. 839, the court said: "In the act we are considering, Congress has expressly declared that transactions and prices of grain in dealing in futures are susceptible to

speculation, manipulation, and control which are detrimental to the producer and consumer and persons handling grain in interstate commerce and render regulation imperative for the protection of such commerce and the national public interest therein." Compare, Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822; Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963; International Organization, United Mine Workers, v. Red Jacket Consolidated Coal & Coke Co., 18 F.(2d) 839 (C. C. A. 4); Southern R. Co. v. United States, 222 U. S. 20, 32 S. Ct. 2, 56 L. Ed. 72; Second Employers' Liability Cases, 223 U. S. 1, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44; Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518; Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524; Pensacola Tel. Co. v. Western Union Tel. Co., 96 U. S. 1, 9, 24 L. Ed. 708; In re Debs, 158 U. S. 564, 591, 15 S. Ct. 900, 39 L. Ed. 1092.

The cases relied on by the defendant in action No. 997, and cited on pages 12 to 15 of the brief, would seem from some expressions therein to support defendant's contention that the regulatory act here involved does not find support in the commerce clause of the Constitution, but the laws discussed in these opinions were entirely different from the one here involved, and the principles announced by the court in each of them only fragments of what we have here to decide.

The Congress found, as a fact, in section 1 of the act here involved (15 USCA §§ 801, 802) that the production of bituminous coal and its distribution bear upon and directly affect interstate commerce and render regulation thereof necessary for its protection. Notwithstanding this solemn declaration by the Congress, the opponents of the act insist that the court should strike it down.

The three pillars of constitutional government standing and recognized by the people of the United States, are the separation of powers, and when any one of the three invade the field of the other, there is an undermining of the very foundation of our system of government, and if persisted in, we will be destroyed.

As I have heretofore pointed out, there have been twelve investigations of the condition of the bituminous coal industry and its effect on interstate commerce, and the general welfare since 1922. It cannot be said that the Congress did not investigate fully on the subject before its declarations were made. It is a delicate task for the judiciary to interfere with the legislative, and I know of no superior avenues of information it has that are not open to the Congress.

Judges are usually occupied with matters specifically brought to their attention, and it could hardly be said they have the current knowledge of the movement of the commerce stream that the Congress of the United States has, and certainly the courts have no power to make a widespread investigation of things that affect interstate commerce. What affects interstate commerce is a question of fact. Commerce is a moving stream, rising, falling, and changing its course with the progress of civilization, and what affects it in one generation may not in another.

The Congress has the power within its field to find facts and define terms as well as the courts. In passing on the constitutionality of an act, the court does not sit as a reviewer of the facts before Congress that prompted it to take legislative action, and when it has found and declared what the facts are and defined what the thing is, and legislated on the subject, the court, in undertaking to overthrow the act, is arrogating to itself the powers of a branch of the government which it does not have. The facts of which the court may take judicial notice, and the ultimate facts as shown in the hearings before the Congress, are some evidence of its declaration that the bituminous coal industry as now conducted affects interstate commerce, and this being true, the court is without power to substitute a different judgment for that of Congress regardless of its opinion as to the wisdom of the legislation.

The opponents of the act content themselves with citing definitions found in court opinions defining interstate commerce, but none of the acts involved in the cases were similar to the one here under consideration, and to that extent citations are of no value to me in passing on this question.

In the case of Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 459, 65 L. Ed. 865, 16 A. L. R. 165, the court said: "No doubt it is true that a legislative declaration of facts that are material only as the ground for enacting a rule of law, for instance, that a certain use is a public one, may not be

held conclusive by the Courts. * * * But a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect."

In the case of Radice v. New York, 264 U. S. 292, 294, 44 S. Ct. 325, 326, 68 L. Ed. 690, the court said: "Where the constitutional validity of a statute depends upon the existence of facts, courts must be cautious about reaching a conclusion respecting them contrary to that reached by the Legislature; and if the question of what the facts establish be a fairly debatable one, it is not permissible for the judge to set up his opinion in respect of it against the opinion of the lawmaker." Compare Holden v. Hardy, 169 U. S. 366, 18 S. Ct. 383, 42 L. Ed. 780; Muller v. Oregon, 208 U. S. 412, 28 S. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957.

It is also claimed by the opponents of the act that it is an attempt on the part of the Congress to exercise power reserved to the states. Of course, if it is the proper regulation of interstate commerce, then the states have no rights in the matter; and if the act covers a joint field, a part of which the federal government could exercise, and a part the states, under such circumstances the federal power becomes supreme. The point was made by counsel in action No. 996, on oral argument, that a part of the plaintiffs' business was intrastate and the act covered both coal mined for state consumption and that for use outside of the state.

The plaintiffs each conduct a single business. There is no separation of the intra from the inter state, and if the Congress were prohibited from legislating on the subject on this account, neither state nor federal authority could legislate on it, because by so doing each would invade the field of the other. Under such circumstances, the right of the federal government becomes paramount, and as long as the plaintiffs do not separate their business as to the two sovereigns, the central government can legislate on the whole subject.

Improved methods of transportation and communication or close association of communities have somewhat wiped out state lines whenever we come to consider political science as applied to government. State isolation no longer exists regardless of legislation. The people of states now compete with each other, where formerly only communities did. Nationally advertised products are so widely used throughout the country that states have no longer, by legislation, the power to regulate industries, however earnest their purpose.

To say that the production of products distributed on a national scale can be effectively controlled by the states is both constitutionally and economically absurd. To deny power in such a field to the national government is tantamount to saying there shall be no legislation concerning them.

We based our treatment of the Indians on Rousseau's principle "that no greater quantity should be occupied than is necessary for the subsistence of the occupiers." Johnson v. McIntosh, 8 Wheat. 543, 5 L. Ed. 681. The reverse of this doctrine is just as applicable to the states, and when they fail or are unable to perform a public duty, the doctrine of states' rights should not be a barrier to the federal government rendering an essential service to the human race. The rights of every state, of every man, and of every race must be limited, as all social liberty must be, by the coequal rights of other states, and of other men brought into government association with them.

Several states of the Union are great producers of bituminous coal, and in those states coal is to them what wheat is to the state of North Dakota. In the case of Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 246, 66 L. Ed. 458, the court had before it an act of the state of North Dakota, referred to as the "North Dakota Grain Grading and Inspection Act," which was attacked on the ground that it regulated business engaged in interstate commerce, and for that reason was in conflict with the Federal Constitution. The court, in holding it was, and that the state had no power to legislate concerning it, said: "That such course of dealing constitutes interstate commerce, there can be no question. This court has so held in many cases, and we have had occasion to discuss and decide the nature of such commerce in a case closely analogous in its facts, and altogether so in principle, Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 42 S. Ct. 106, 66 L. Ed. 239. In that case the facts disclose that a company organized in Tennessee and carrying on business there, went into Kentucky and, through an agent there, bought wheat for

shipment to the company's mill in Tennessee. The state court held that the transaction was merely a purchase of wheat in Kentucky, and made the Tennessee company amenable to the regulatory statutes of the State. This court rejected the conclusion of the state court, and held that the buying, no less than the selling of grain under such circumstances was a part of interstate commerce, committed to national control by the Federal Constitution. Applying the principle of that decision, and the previous decisions of this court cited in the opinion, the complainant's course of dealing in the buying of grain, which it purchased and sold under the circumstances as herein disclosed, was interstate commerce. Being such, the State could not regulate the business by a statute which had the effect to control and burden interstate commerce." Compare Foster-Fountain Packing Co. v. Haydel, 278 U. S. 1, 49 S. Ct. 1, 73 L. Ed. 147; Houston, E. & W. T. R. Co. v. United States (Shreveport Case), 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; Simpson et al. v. Shepard (Minnesota Rate Case), 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

■ Section 1 of the act (15 USCA §§ 801, 802) declares that the mining of bituminous coal and its distribution by the producers thereof in and throughout the United States are affected by a national public interest. Notwithstanding this declaration, the opponents of the bill claim it is not true that the court is compelled to so decide. What I have heretofore said concerning the declaration in the bill as to interstate commerce is equally applicable here, and this court is without power to overthrow the findings of the Congress, because there is substantial basis for them. Even if the court had power to determine the question for itself, there is a firm basis for the conclusion that bituminous coal is affected with a public interest. I will not again repeat the facts heretofore set out which show this to be true.

The great number of persons employed in the industry, its dangers, and the wide use of its product have been a matter of concern to both the states and the federal government from the very beginning of mining in the United States. Living in communities apart from other people, the miners have acquired characteristics and terminology peculiar to themselves. The nature of their work in the silence and dark of the mines conduces to rumination. The long hours and arduous work have been preventive of leisure. Mining has always attracted the sympathy of the people to those who work underground. Any person who has read Wade's History of the Middle and Working Classes of England can't but feel a deep interest in those people who go down into the bowels of the earth and bring out of it the fuel for most of the power that drives our industrial machines and provides heat that keeps us warm.

The miners' silent occupation, living apart, causes him to think of his hard lot and use every power at his command to improve his condition. Because of this, the industry has been one of frequent controversy between employer and employee. In recent years the highest officials of the United States, including the President, have had to use their influence and power to avoid a nation-wide strike in the bituminous coal fields. These controversies have led to murders and disorders of all kinds. Every public official, including federal judges, in states where this industry is carried on, knows of these recurring disorders. To say it is not affected with the public interest is simply to ignore the facts.

The loss of life, the maimed and crippled, one of the prices of conducting the business, has been the subject of legislation in every state where it is carried on. The poverty that pervades the coal field due to disorderly production and marketing awakens the sympathy of all who live in the midst of it. The public burden of maintaining the miner who is out of employment, and his family, is one that affects every taxpayer in every community where the industry is carried on, and under present conditions this is a burden on the government of the United States, because it now must contribute to the maintenance of the unemployed miner and his family.

Not only the economic, but the political future of the United States is greatly concerned with the condition of the mining industry. No people ever feel the want of work or the pinch of poverty for a long time without reaching out violent hands against their political institutions, believing they may find in a change some relief from their distress.

The area of unlimited expansion on every side in the United States, a period where any one could reach out and obtain

the desired goods provided for us by the hand that laid the foundations of the earth, is drawing to a close. No one would believe or could conceive that the Founding Fathers, when they closed the book and put on the last page thereof, "The Constitution of the United States," did not place power in the federal government to conserve its natural resources. The mineral wealth stored in the earth can be used only once, and when the oil is pumped out, coal is the only remaining source of power except water.

From the sea, the mine, the forest, and the soil must be gathered everything that can sustain the life of man. From these must be conditioned forever, so far as we know, man's progress and his continued existence on earth. · Our supply of bituminous coal is not inexhaustible. The use of it and its by-products becomes more important daily in our lives. We are rapidly exhausting the more accessible deposits of the mineral, and the future of mining means diminishing returns and higher prices.

Certainly no man would have the temerity to say that the federal government, because of lack of power, must idly stand by and see its forests cut down, its soil impoverished, and its minerals exhausted, resulting in destitute cities and an impoverished countryside. It may, likewise, be said that the framers of the Constitution did not intend for the government to wait until its natural resources were practically exhausted before taking any steps to conserve them. The Supreme Court in Appalachian Coals, Inc., v. United States, 288 U. S. 344, 372, 53 S. Ct. 471, 478, 77 L. Ed. 825, said: "When industry is grievously hurt, when concerns fail, when unemployment mounts and communities dependent upon profitable production are prostrated, the wells of commerce go dry."

In the case of Holden v. Hardy, supra, the Supreme Court had before it an act of the Legislature of the state of Utah, which undertook to regulate the period of employment of workmen in all underground mines and smelters or other institutions for the reduction or refinement of ores. · It was claimed that the act was violative of the Fourteenth Amendment. The court in the opinion reviewed generally the public laws enacted by the various states in reference to the control and regulation of mining and sustained the act. It has since that decision sustained other state legisla-

tion on the subject, notably Booth v. Indiana, 237 U. S. 391, 396, 35 S. Ct. 617, 59 L. Ed. 1011; Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 540, 34 S. Ct. 359, 58 L. Ed. 713; Consolidated Coal Co. v. Illinois, 185 U. S. 203, 207, 22 S. Ct. 616, 46 L. Ed. 872; Knoxville Iron Co. v. Harbison, 183 U. S. 13, 21, 22 S. Ct. 1, 46 L. Ed. 55.

The mining of coal has been as much regulated by public law as the milk industry in the state of New York, and in the case of Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 512, 78 L. Ed. 940, 89 A. L. R. 1469, the Supreme Court held that the milk industry in that state, having been subjected to previous regulation, could be further regulated by a law of the state of New York controlling the sale price and distribution thereof. The court said:

"The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. Regulation of a business to prevent waste of the state's resources may be justified. And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency.

"Legislation concerning sales of goods, and incidentally affecting prices, has repeatedly been held valid. In this class fall laws forbidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers, and by other forms of price discrimination. The public policy with respect to free competition has engendered state and federal statutes prohibiting monopolies, which have been upheld. ·On the other hand, where the policy of· the state dictated that a monopoly should be granted, statutes having that effect have been held inoffensive to the constitutional guarantees. Moreover, the state or a municipality may itself enter into business in competition with private proprietors, and thus effectively although indirectly control the prices charged by them."

The Supreme Court of Kansas, in the case of State ex rel. Hopkins v. Howat, 109 Kan. 376, 198 P. 686, 703, 25 A. L. R. 1210, 1242, well expressed why mining of

coal is affected with a public interest, and said: "The Legislature was of the opinion the industries specified in section 3 of the act of 1920 are affected with a public interest, and so declared. The declaration did not make them so. Whether they are or not depends on their relation to public interest. Without presenting the facts of which the court takes judicial knowledge concerning the peculiar relation the product of the Kansas coal mines bears to the state's fuel supply, and without discussing further the peculiar conditions under which production is accomplished, the court concludes the business of producing coal bears an intimate relation to the public peace, good order, health, and welfare; that such business is affected with a public interest; and that such business may be regulated, to the end that reasonable continuity and efficiency of production may be maintained."

Coal being a national wasting asset of the United States, it is in the nation's interest that it should be used and worked to the best advantage. Under the power of Congress to levy taxes for the general welfare, it could, if deemed necessary, levy taxes and make appropriations out of same to acquire all bituminous coal properties from the present owners and nationalize them for the public good. It would be a lopsided system of government that lacked the power to regulate an industry, but had the power to acquire it outright for the public good.

Having decided that the production, sale, and distribution of coal affects interstate commerce, and that it is affected with a public interest, it now becomes necessary to decide whether the questioned act violates the Fifth Amendment.

■ The provisions of the act are pointed out in the part of this opinion where the substance of the pleadings is stated. It primarily is intended to control wages, prices, production, and distribution. However, in view of the fact that the interstate commerce clause of the Constitution is applicable, and the coal industry is affected with a public interest, the Congress has the power to make reasonable regulations or laws relating to wages, production and marketing.

The prevention of price cutting in the sale of bituminous coal in interstate commerce below the average minimum cost of production in the several districts is a matter on which the Congress has the power to legislate. See Nebbia v. New York, supra; Lemke v. Farmers' Grain Co., supra; Flanagan v. Federal Coal Co., 267 U. S. 222, 45 S. Ct. 233, 69 L. Ed. 583; Local 167, I. B. of T. v. United States, 291 U. S. 293, 295, 54 S. Ct. 396, 78 L. Ed. 804.

It also has the power to provide for the regulation of wages and hours. Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; Block v. Hirsh, 256 U. S. 135, 157, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165.

■ The administrative provisions of the act do not delegate legislative power. In Panama Refining Co. v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 251, 79 L. Ed. 446, the court said: "Applying that principle, authorizations given by Congress to selected instrumentalities for the purpose of ascertaining the existence of facts to which legislation is directed have constantly been sustained. Moreover the Congress may not only give such authorizations to determine specific facts, but may establish primary standards, devolving upon others the duty to carry out the declared legislative policy; that is, as Chief Justice Marshall expressed it, 'to fill up the details' under the general provisions made by the Legislature."

Judicial review of all administrative orders and decisions is accorded under section 6 (b) of the act (15 USCA § 810 (b). There is no denial of judicial process and the exercise of arbitrary power is not lodged in any person charged with the administration of the act.

■ The tax provisions of the act are not an unconstitutional exercise of the taxing power. Taxation has been used for many purposes other than the raising of revenue since the Constitution was adopted. But for the power lodged in Congress to levy taxes, there is a reasonable probability that for a long time only eleven states of the Union would have accepted the Constitution.

The power to levy a tax on imports was applied to two recalcitrant states to compel their acceptance of the Constitution, which they promptly did after this imposition.

There is only one exception and two qualifications to the taxing power of the Congress. It cannot tax exports, and di-

rect taxes must be imposed by the rule of apportionment, and indirect by the rule of uniformity.

It has the power to tax for the purpose of regulation, McCray v. United States, 195 U. S. 27, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; Alaska Fish Co. v. Smith, 255 U. S. 44, 49, 41 S. Ct. 219, 65 L. Ed. 489.

There is a further limitation by the rule of construction on the taxing power of Congress, which is fully recognized. It cannot be used for the purpose of promoting, retarding, or destroying a business within the exclusive province of the states, and if the tax provided in this act were solely for the purpose of regulating or controlling the bituminous coal industry, and it was purely intrastate business, it would be an unconstitutional use of the taxing power by the Congress; but as it is a business affecting interstate commerce, the Congress has the power to levy the taxes solely for the purpose of regulating and controlling the industry. To the extent of 1½ per cent. on the sale price per ton the tax is uniform as to all of those within the class, and the classification fair and equitable. Thirteen and one-half per cent. of the sale price per ton is a penalty, although called a tax. Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Bailey v. Drexel Furniture Co., 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432.

It is the duty of the courts to hold fast to the separation of powers under our system of government. The delicate duty of the Judicial Department to hold an act enacted by the Congress void because in conflict with the Constitution should never be exercised unless the judge feels a clear and strong conviction of their incompatability beyond a reasonable doubt. No judge should ever by his conduct in passing on the constitutionality of an act subject the judiciary to the criticism that it was exercising legislative power or the power of the executive to veto.

In considering the future of the states of the Union, we must keep in mind the powers of government they can efficiently exercise. Modern technology has broken down barriers of space and time. Nationwide organizations of every large industry in the United States, nation-wide advertisements of products over the radio, the construction of nation-wide highways, the development of the airplane, a rapid system of transportation and communication, have made the states helpless in controlling and regulating commerce. If we cling to the doctrine of states' rights in the matter of commerce as it existed in the early days of the Republic, a palsied hand holds the power and decay will set in in our Nation before it's time. If commerce is to be regulated and controlled for the public welfare in this country, it must be by the national government, because the states lack the power to make effective their own regulations.

I direct that a judgment be drawn dismissing the petition in action No. 996, R. C. Tway Coal Company v. Glenn, Collector; and the prayer of the petition be granted in action No. 997, Clark v. Tway Coal Company; and that an order be drawn in action No. 808, Baltimore Trust Company v. Norton Coal Company, directing the receivers to comply with the act.

However, in view of the serious contention made in this case by the opponents of the act as to its constitutionality, I believe the enforcement of the court's judgment in actions No. 996 and No. 997 should be postponed pending an appeal of the decision to the Circuit Court of Appeals and the Supreme Court, on condition that all the plaintiffs in action No. 996 pay to the clerk of this court monthly 1½ per cent. of the sale price per ton for all coal mined and produced by each of them, and in addition thereto 1 per cent. of the sum paid in each month for the payment of clerk's fees. On failure to pay any one of the installments at due date, this stay will be set aside.